Guy Ruttenberg, Bar No. 207937
guy@ruttenbergiplaw.com
Bassil Madanat, Bar No. 285280
bassil@ruttenbergiplaw.com
Dennis Ma, Bar No. 284761
dennis@ruttenbergiplaw.com
RUTTENBERG IP LAW, A PROFESSIONAL
CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260

*Attorneys for Plaintiffs*
Jason Hullinger, Benjamin de Bont and
Agora Systems LLC

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON HULLINGER, an individual, BENJAMIN DE BONT, an individual, AGORA SYSTEMS LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>KUNAL ANAND, an individual, JULIEN BELLANGER, an individual, PREVOTY, INC., a Delaware corporation, JAMIE MCNIEL, an individual, MICHAEL STERN, an individual, ADAM LILLING, an individual; PLUS CAPITAL, L.P., a Delaware limited partnership, PLUS VENTURES TMG I, LLC, a California limited liability company, PLUS VENTURES GEE, GP, a California general partnership, DAN KAMINSKY, an individual, U.S. VENTURE PARTNERS, a California partnership; U.S. VENTURE PARTNERS, XI, L.P., a Delaware limited partnership; KARLIN VENTURES, LLC, a Delaware limited liability company, LAUNCHPAD LA, LLC, a Delaware limited liability company, LAUNCHPAD LA FUND II, L.P., a Delaware limited partnership; SAM TELLER, an individual.<br><br>Defendants. | Case No. 2:15–cv–07185–SJO–FFM  [Assigned to Hon. S. James Otero]<br><br>**THIRD AMENDED AND SUPPLEMENTAL COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**JURY TRIAL DEMANDED** |

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

## THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiffs Jason Hullinger, Benjamin de Bont and Agora Systems LLC (collectively "Plaintiffs"), by and through their undersigned attorneys, file this Third Amended and Supplemental Complaint, and allege the following:

## NATURE OF ACTION

1.     This action arises from Defendant Kunal Anand's blatant breach of his fiduciary duties as a co-member, managing member and CEO of Agora Systems LLC ("Agora") and subsequent misappropriation of intellectual property and other proprietary information and property rightfully owned by Agora, to the detriment of the company and its other co-founders, Jason Hullinger and Benjamin de Bont.

2.     Despite what appeared to be a productive and trustworthy business relationship between Anand, Hullinger and de Bont, Anand ultimately defrauded the latter two members, purported to unilaterally dissolve and cancel Agora, surreptitiously formed a competing business, Prevoty, Inc. ("Prevoty"), and misappropriated Agora's online security technology and source code for use in conjunction with Prevoty's business.  Defendant Bellanger willingly and knowingly assisted Anand in these actions.

3.     By this action, Plaintiffs seek, among other things, judicial reinstatement of the wrongfully dissolved/cancelled Agora, a declaratory judgment reinstating Plaintiffs' title to their physical and intellectual property that was wrongfully converted by the defendants, injunctive relief halting the defendants' ongoing unfair competition, as well as misappropriation and infringement of Plaintiffs' intellectual property rights, and damages for the numerous violations that the defendants have committed thus far.

## PARTIES

4.     Plaintiff Jason Hullinger ("Hullinger") is an individual residing in Los Angeles, California.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

5.     Plaintiff Benjamin de Bont ("de Bont") is an individual residing in Seattle, Washington.

6.     Hullinger, de Bont and Defendant Kunal Anand ("Anand") associated to carry on, as co-owners, a business for profit, and thereby formed a partnership. Hullinger, de Bont and Anand initially operated their business as a partnership under the names Sphinx Systems, Agora Systems and/or Agora Security, but ultimately they agreed to convert the business into a California limited liability company and register it under the name Agora Systems LLC.  Plaintiff Agora Systems LLC ("Agora") is that business.  Agora is a limited liability company organized under the laws of California.  Defendant Kunal Anand purported to cancel Agora through fraudulent filings with the California Secretary of State, but those fraudulent filings are null and void.  To the extent necessary, the Certificate of Cancellation should be nullified and/or the LLC should be reinstated.

7.     Defendant Anand is an individual residing in Marina del Rey, California.

8.     Defendant Julien Bellanger ("Bellanger") is an individual residing in Los Angeles, California.

9.     Defendant Prevoty, Inc. ("Prevoty") is a corporation organized and existing under the laws of Delaware, having its principal place of business in Los Angeles, California.

10.     Defendant Jamie McNiel ("McNiel") is an individual residing in Los Angeles, California.

11.      Defendant Michael Stern ("Stern") is an individual who resides in Mill Valley, California.

12.      Defendant Adam Lilling is an individual who resides in Los Angeles, California.

13.      Defendant Plus Capital, L.P. ("Plus Capital") is a limited partnership organized and existing under the laws of Delaware, having its principal place of business in Los Angeles, California.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

14.    Defendant Plus Ventures TMG I, LLC ("Plus Ventures TMG") is a limited liability company organized and existing under the laws of California, having its principal place of business in Los Angeles, California.

15.    Defendant Plus Ventures Gee, GP ("Plus Ventures Gee") is a general partnership having its principal place of business in Los Angeles, California.

16.    Adam Lilling invested in Prevoty through his investment vehicles Plus Capital, Plus Ventures TMG, and Plus Ventures Gee.  Adam Lilling, Plus Capital, Plus Ventures TMG and Plus Ventures Gee are collectively referred to as "Lilling."

17.    Defendant Dan Kaminsky ("Kaminsky") is an individual who resides in San Francisco, California.

18.    On information and belief, Defendant U.S. Venture Partners is an unincorporated partnership and existing under the laws of California, having its principal place of business in Menlo Park, California.  On information and belief, Partners include Mr. Steve Krausz (a managing member) and Ms. Dafina Toncheva.

19.    Defendant U.S. Venture Partners, XI, L.P. ("USVP XI") is a limited partnership organized and existing under the laws of Delaware, having its principal place of business in Menlo Park, California.

20.    U.S. Venture Partners invested in Prevoty through its investment vehicle USVP XI.  U.S. Venture Partners and USVP XI are collectively referred to as "USVP."

21.    Defendant Karlin Ventures, LLC ("Karlin") is a limited liability company organized and existing under the laws of Delaware, having its principal place of business in Los Angeles, California.

22.    Defendant Launchpad LA, LLC ("Launchpad LA") is a Delaware limited liability company with its principal place of business in Santa Monica or Los Angeles, California.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

23.     Defendant Launchpad LA Fund II, L.P. ("Launchpad II") is a Delaware limited partnership with its principal place of business in Santa Monica or Los Angeles, California.

24.     Defendant Sam Teller is an individual residing in Santa Monica or Los Angeles, California.

25.     Launchpad LA invested in Prevoty through its investment vehicle Launchpad II.  At all relevant times, Sam Teller has been the Managing Director and Co-Founder of Launchpad LA and Launchpad II.  Launchpad LA, Launchpad II and Mr. Sam Teller are collectively referred to as "Launchpad."

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction for this action pursuant to 28 U.S.C. §§ 1331, 1338 and 1367.

27.     This Court has personal jurisdiction over Defendants because, among other things, Defendants are California citizens and residents of the State of California, and they live and work in this Judicial District.  Defendant Prevoty maintains a business location in the State of California, and transacts business by promoting, advertising and selling products and/or services in the State of California, including products and/or services that infringe Plaintiffs' intellectual property rights.

28.     Venue is proper under 28 U.S.C. §§ 1391 (b) and (c) because, among other things, all Defendants are residents of this Judicial District and the State of California.  In addition, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this Judicial District, and a substantial part of the property that is the subject of this action is situated in this Judicial District.  Defendants also operate at least one office location within this District, transact business within this District and promote, advertise and sell products and/or services in this District.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

## **FACTUAL BACKGROUND**

### **Hullinger, de Bont and Anand Are**
### **Co-Founders, Co-Members and Co-Owners of Agora**

29.    Hullinger, de Bont and Anand associated to carry on, as equal co-owners, a business for profit.  During the late summer or early fall of 2010, Anand and Hullinger approached de Bont at a hotel bar in or near Beverly Hills, California.  Hullinger, de Bont and Anand agreed to create a company whose purpose would be to develop and commercialize an application security monitoring system for managing internet-based user-generated content.  Specifically, the technology would use a new method of parsing, tokenizing and data filtering (called content transformation) to prevent malicious users from attacking applications and networks in order to gain sensitive information from other users or the system's database.  In doing so, the technology would reduce the risks of various content injections, such as cross-site scripting (XSS) and structured query language (SQL) injections, by these malicious users.  The three co-founders (Hullinger, de Bont and Anand) initially also agreed that each of them owns an equal one-third interest in the company.

30.    Initially, Hullinger, de Bont and Anand operated their company under varying names such as Sphinx Systems, Agora Systems and/or Agora Security.  Around January or February 2012, Hullinger, de Bont and Anand decided to register their company formally so that the company could properly execute agreements with other companies.  The three co-founders discussed registering the company as a limited liability company or incorporating the company.

31.    In or around February 2012, Hullinger, de Bont and Anand orally and/or implicitly agreed to register their company as a California limited liability company, ultimately naming it Agora Systems LLC.  Hullinger, de Bont and Anand orally and/or implicitly agreed that each of them owns an equal share of Agora, consistent with their equal share of the business before it was registered as a limited liability company.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

32.     For example, on February 10, 2012, Anand wrote an email to de Bont and Hullinger, indicating that he was in the process of registering the limited liability company on behalf of the three co-founders and equal co-owners.  In the February 10, 2012 email, Anand confirms that "we" (i.e., the three co-founders) "should probably decide on a name and acquire domains today – we can try and grab names from auctions."  Anand also added, "The most important thing we need to craft today is our operating agreement / commitment agreement," again confirming that the resulting company was intended to be owned by all three co-founders.  A true and correct copy of the February 10, 2012 email from Anand to de Bont and Hullinger is attached hereto as Exhibit A.

33.     Ultimately, the parties agreed to register and use the domain name agorasec.com for their business.  They also agreed to proceed with registering the business as a California limited liability company under the name "Agora Systems LLC."  The three co-founders did not finalize a written operating agreement or commitment agreement and, accordingly, proceeded in accordance with an oral and implicit agreement to create a limited liability company.

34.     Upon the co-founder's agreement to register their business as a limited liability company, Anand took it upon himself to implement the decision and register the business as a California limited liability company.  On or about February 15, 2012, co-founder de Bont offered to assist Anand with the process of filling out the paperwork and registering the company as a California limited liability company.  Anand declined and proceeded to act on behalf of all three co-founders.

35.     The three co-founders further agreed that each of them would hold an officer position within Agora.  Anand held the title of Chief Executive Officer (CEO), Hullinger held the title of Chief Technology Officer (CTO) and de Bont held the title of Chief Operating Officer (COO).

36.     In mid February 2012, on behalf of the three co-founders, Anand filed Articles of Organization for Agora with the California Secretary of State.

37.    The Articles of Organization for Agora indicate that the limited liability company would be managed by all of its members.  The Articles of Organization for Agora do not, however, identify the members or the number of members.  The Articles of Organization were accepted by the Secretary of State—and Agora came into existence as a California limited liability company—on or about February 22, 2012.

38.    Hullinger, de Bont and Anand were each equal members of Agora when it was formed on or about February 22, 2012.  All three members undertook officer roles in the company to act for the benefit of one another and for the benefit of Agora.

39.    On information and belief, no documents were filed with the Secretary of State in conjunction with the Articles of Organization for Agora to indicate the membership of Agora.  However, in the alternative, to the extent Anand somehow registered himself as the sole shareholder of Agora, Anand held two-thirds of that ownership in trust for Hullinger and de Bont.  Hullinger and de Bont each owned one-third of Agora before the company was registered as a limited liability company.  The decision to continue operating Agora as a limited liability company was premised on the continued ownership by each of the three co-owners of their respective interests in the company.  In discussing the registration of Agora, Anand warranted that de Bont and Hullinger would be equal members and co-owners of the limited liability company.

40.    The three co-founders operated their business through the limited liability company, and Anand would be unjustly and unfairly enriched, but for a trust, in the event that he somehow registered himself as the sole member/owner of Agora.

41.    On March 30, 2012, Anand filed Agora's Statement of Information with the California Secretary of State, falsely and/or incorrectly identifying himself as the sole managing member of Agora.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

42.     After submitting the March 30, 2012 Statement of Information, Anand continued to represent to third parties, as well as to de Bont and Hullinger, that they were equal members and co-owners of Agora.  For example, shortly after he filed the Statement of Information with the California Secretary of State, Anand and Hullinger discussed the possibility of partnering with a certain technology reseller. In the context of that discussion, Anand wrote to Hullinger: "Obviously I won't sign anything or commit to anything without you guys."

43.     On May 1, 2012, Anand sent Hullinger and de Bont an email representing that the "LLC has been amended" to include both of them as co-founders (the "May 1, 2012 email").  In the May 1, 2012 email, Anand represented that a "revised Statement of Information document has been sent to the State of California." Addressing the members' respective ownership interests, Anand wrote: "Since there's an uneven percentage with there being 3 co-founders, it is set up as: Ben: 33.33%[,] Jason: 33.33%[,] Kunal: 33.34%."  Anand continued: "We can change these percentages without going through the state – we can rock/paper/scissors for the .01%."  A true and correct copy of the May 1, 2012 email is attached hereto as Exhibit B.

44.     Hullinger and de Bont reasonably and justifiably relied upon Anand's representations in the May 1, 2012 email, as well as other representations, promising that the California Secretary of State records would reflect the equal ownership and membership of each of Anand, Hullinger and de Bont.  Hullinger and de Bont believed that certain California Secretary of State records were amended to reflect their correct ownership interests, as promised by Anand and as originally agreed to by the three partners in or around February 2012.  Hullinger and de Bont also reasonably relied on Anand's representation that he filed an amended Statement of Information with the California Secretary of State.

45.     Relying on Anand's representations, Hullinger and de Bont continued to collaborate with Anand as part of Agora.  The three partners acted on behalf and for

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

the benefit of one another and for the benefit of Agora.  Over the course of 2012, the three co-owners worked together to develop security software technology, including a product that they promoted under the name "Agora Blue."

46.   Through Agora, Hullinger, de Bont and Anand also worked together as co-owners to reach out to prospective investors and potential customers, repeatedly holding themselves out as co-founders of Agora, as well as a "cohesive and hard-working team," in pitch decks and presentations.  For example, one pitch deck that was sent to a potential investor notes that Agora was "[f]ounded by Kunal Anand, Ben de Bont, and Jason Hullinger," that the founders were a "team," and that "Agora Blue has been under development for more than a year."

47.   In conjunction with developing security software technology including Agora Blue, the three partners (Hullinger, de Bont and Anand) also collaborated to develop and optimize source code for the technology ("Agora Blue Source Code").

48.   Hullinger, de Bont and Anand worked as partners to promote Agora Blue as a product developed for and owned by Agora.  For example, Agora's Company Information PowerPoint, which was intended for distribution to potential investors, stated: "Agora makes data safe through *revolutionary* security appliances and professional services . . . . [The] [f]irst product is Agora Blue – developed and tested over the last year[.]"

49.   The co-founders of Agora also collaborated to create an on-line demo known as the "Sandbox," where prospective customers and investors could try out some of Agora's product offerings and observe the technological advances offered through Agora's technology.  The "Sandbox" demo was available at http://www.agorasec.com/sandbox/.  The demo enables interested parties to evaluate the effectiveness of Agora's proprietary algorithms.

50.   Hullinger created the initial version of the Sandbox, which Hullinger had up and running as early as May 3, 2012.  Hullinger and his co-founders, including Anand, subsequently made further refinements and updates to the Sandbox.  All of

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

the work to the Sandbox was made in the context of the co-founders' work for Agora.

51.    While developing their flagship Agora Blue technology, Hullinger, de Bont and Anand also worked as co-owners to establish the structure and operations of Agora.  For example, the team registered the domain name agorasec.com, and each of the three co-founders was assigned an email account ending with @agorasec.com.

52.    The three co-founders and co-owners also collaborated to create detailed financial projections outlining their working capital, disbursements, costs and staff needs.  As reflected in these financial projections, each of the three co-founders was expected to draw an annual salary of $175,000.

53.    On or around May 21, 2012, Agora entered into an agreement with a customer, through which Agora was retained and compensated to perform an "Application Penetration Test to assess the level of security awareness evident in the design of [the customer's] web sites and API's to estimate the likelihood of application issue."  Agora completed the Application Penetration Test by June 8, 2012.

54.    As of 2012, Agora was a revenue-generating company.

55.    The three co-founders and co-owners also agreed to open bank accounts for Agora.  On or around June 8, 2012, Anand and Hullinger opened four bank accounts for Agora in Los Angeles, with each of them having signing authority over the accounts.  When the accounts were created, de Bont was not in Los Angeles and therefore could not be added to the accounts.  Per the May 1, 2012 email, it was anticipated that de Bont would be added as a signatory to the accounts at a later time.

56.    On or around June 22, 2012, Agora sent an executive summary to a potential Agora investor indicating that Agora's ***founding team*** consists of Anand as CEO, de Bont as COO and Hullinger as CTO.  On or around June 28, 2012, the

potential Agora investor inquired as to the "status" of Agora as a company.  On the same day, Anand wrote to Hullinger and de Bont, proposing the following response to the investor on behalf of Agora: "Status: We're a ***three person startup***, currently setup as a California LLC. We are [in] the process of seeking external capital."  Anand also indicated that Agora "plan[s] on growing the team to 11 people and plan[s] on achieving operational break even in April 2014," that Agora has "booked revenue from professional services," and that Agora is "looking to raise [$]4.5 million in [its] first round."

57.   Anand's June 28, 2012 proposal further confirms that Hullinger and de Bont were and continue to be members and co-owners of Agora.

58.   Throughout 2012, Anand repeatedly acknowledged to potential customers and investors that he, Hullinger and de Bont were co-owners and co-founders of Agora.  On or around July 19, 2012, a prospective investor noted that Hullinger, de Bont and Anand were "an exceptionally talented team."  On or around July 20, 2012, Anand wrote to his two co-founders (Hullinger and de Bont) noting that the prospective investor was "impressed with us as a team."

59.   In July 2012, Hullinger executed a business contract on behalf of Agora, indicating his role as "CTO" of Agora adjacent to his signature.

60.   Hullinger, de Bont and Anand were not paid salaries or hourly wages while working for Agora.  Instead, the three co-founders agreed that each of them owns an equal share in the company.

61.   As co-owners of the business, Hullinger and de Bont made significant personal contributions and sacrifices toward Agora's efforts.

62.   For example, Hullinger personally relocated to Calabasas, California from Seattle, Washington, so that he could live close to Anand and Agora's business center.

63.   Similarly, de Bont also offered to relocate to Calabasas, California from Seattle, Washington, but Anand suggested he postpone the move.  In the interim, de

Bont made repeated trips to Los Angeles, and paid for his own airfare, in order to participate in regular Agora meetings and projects.  de Bont also paid for Agora to maintain third-party accounts such as an account with salesforce.com.  Agora kept records of de Bont's financial contributions, and those records were maintained on the agorasec.com network.

64.     Each of Hullinger and de Bont contributed well over 1,000 man-hours to the development of Agora and its business.

## Anand Introduces Bellanger

65.     In or around December 2012, Anand introduced Hullinger and de Bont to his friend, Defendant Bellanger.  Anand told Hullinger and de Bont that Bellanger had strong industry connections and could be very helpful in securing investment funding for Agora.  Based on these potential connections, Anand suggested that Bellanger join Agora.

66.     On or around January 12, 2013, Anand sent an email to Hullinger and de Bont, confirming that he "just gave Julien an Agora email (julien.bellanger)."

67.     At the invitation of Anand, Bellanger took on a role akin to a director of Agora and advisor to Agora.  Bellanger received and accepted access to Agora's confidential and proprietary materials.  Agora and its members placed their trust and confidence in Bellanger and his integrity.  Bellanger voluntarily assumed and accepted that trust and confidence.

68.     For example, Bellanger's role at Agora specifically called for him to assist the company with identifying potential investors and customers, as well as assisting with strategies for developing the technology and organization of Agora. Bellanger voluntarily assumed this role.

69.     Bellanger voluntarily worked with Hullinger, de Bont and Anand to pitch the company to various potential customers and investors.

70.     Bellanger was included in Agora's strategic decisions and fundraising efforts.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

71.    Bellanger voluntarily became privy to communications and decision-making regarding Agora's pitches to customers, funding ideas and optimization of the Agora Blue technology.

72.    Bellanger also negotiated with and set out to engage law firms to represent Agora.  For example, on or about February 5-6, 2013, Bellanger met with one or more law firms soliciting proposals to represent Agora, including in conjunction with patent applications.  On February 6, 2013, Bellanger sent Hullinger, de Bont and Anand an email confirming that he and Anand were interviewing law firms and recommending that Agora engage a specific attorney—namely, David Young from the Cooley law firm.  In the email, Bellanger refers to himself as part of the Agora team, and indicates that he expects to manage Agora's outside counsel.  For example, Bellanger writes that the law firm's offer "seems good as we can defer a good amount of costs.  I am planning on asking [the lawyer] for a fixed price package that will include the incorporation, IP, and first commercial contracts so we control costs."

73.    Based upon the trust and confidence placed in him, Bellanger voluntarily became an advisor and provided advice to Agora with respect to strategic decisions relating to investment and customer opportunities.

74.    Bellanger's roles with Agora voluntarily placed him in a special position of trust and confidence with respect to Agora and its members.  In accepting these roles, Bellanger agreed to act for the benefit of Agora and its members/co-owners, including Hullinger and de Bont.

75.    On information and belief, Bellanger and Anand discussed various possible roles for Bellanger as part of Agora.  On information and belief, Anand and/or Bellanger proposed that Bellanger might assume the position of CEO at Agora.  Anand specifically communicated this proposal to de Bont, although de Bont and Hullinger never agreed to give up any equity or ownership interest in Agora at any time.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

76.    By taking on a role to act on behalf of and/or for the benefit of Hullinger, de Bont and Anand and for the benefit of Agora, holding himself out as a part of the company's team, and accepting access to the company's proprietary and confidential materials, Bellanger also undertook fiduciary obligations to Agora and its members/partners, including Hullinger and de Bont.

## Agora Planned to Seek Patent Protection

77.    As part of their innovation strategy, the Agora members decided to patent their proprietary technology, including the technology underlying Agora Blue.

78.    Beginning at least as early as mid-2012 and continuing at least until February 2013, the three co-founders (Anand, Hullinger and de Bont) discussed ideas for protecting their technology through patent applications.

79.    Beginning in mid 2012, various Agora pitch decks noted that patent applications were in progress or pending for Agora Blue, its algorithms, content transformations and/or content parsers/analyzers. Another Agora pitch deck referenced anticipated patents relating to "[p]rotect[ing] against Cross-Site Scripting via content transformations combined with traditional black and white listing."

80.    On or about June 4, 2012, Hullinger circulated to Anand and de Bont ideas for provisional patent applications.

81.    At one point, the co-founders' financial projections included an estimate of $20,000 per month for "patent costs" under "legal expenses" for November 2012 through January 2013.

82.    Beginning in late 2012 or early 2013, the three co-founders searched for legal counsel who could help them secure patent protection. After he came on board, Bellanger also joined the effort to locate patent counsel. Acting on behalf of Agora, Anand and/or Bellanger interviewed potential law firms, and Anand forwarded along to Hullinger and de Bont at least one proposal from a major national law firm.

83.     Anand, Hullinger and de Bont recognized that they worked together on the technology underlying Agora Blue and, therefore, that each should be identified as an inventor on any prospective patent applications.

84.     Despite Bellanger's new involvement with Agora, the original co-founders reaffirmed that each of them should be listed as inventors on any patents relating to Agora Blue—to the exclusion of Bellanger, who had joined later and therefore did not contribute to conception of the technology.  Bellanger was of the same view.

85.     On or about February 5, 2013, Anand explicitly confirmed to de Bont that "[Bellanger] is not on the patents – he joined after the IP was developed . . . he already knows that . . . **the 'inventors' of the patent will be us three** . . . for [B]lue itself."  Anand further indicated that the team would file a provisional patent application for Agora Blue "immediately."

<u>**Success of Agora**</u>

86.     By February 2013, the Agora of Hullinger, de Bont and Anand was well on its way to success.

87.     By February 2013, Agora was offering customers working products, including Agora Blue.

88.     By February 2013, the Agora Sandbox was attracting attention from prospective customers and investors, including industry leaders.

89.     By February 2013, Agora had executed confidentiality and/or non-disclosure agreements with notable industry players in the social media space.

90.     By February 2013, Agora was holding promising meetings with potential investors—and receiving positive feedback, including with respect to the make-up of its team.

91.     By February 2013, Agora was in the process of engaging law firms to review professional services contracts and prosecute patents.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

92.   In February 2013, the three co-founders (Anand, Hullinger and de Bont) communicated to each other that they were very happy with Agora's progress.

93.   For example, on or about February 5, 2013, de Bont wrote to Anand that things were "getting exciting."  Anand responded, "i know - all starting to come together."

94.   On or about February 5, 2013, Anand sent Hullinger, de Bont and Bellanger a status report on Agora's progress with its demos for two potential social networking customers.  In the status report, Anand indicated that Agora was getting "closer to a commercial agreement – something that's really going to be helpful for fundraising."

95.   As of February 2013, the three co-founders (Anand, Hullinger and de Bont) were discussing the need to assemble and finalize an advisory board.  To that end, on or about February 5, 2013, Anand asked de Bont to make an introduction to a prospective advisor in Seattle, which de Bont agreed to do.  de Bont explained that the prospective advisor in Seattle was happy to help once he became convinced of Agora's "team and product."

96.   On or about February 6, 2013, at approximately 4:41 pm, de Bont circulated an email to Anand, Hullinger and Bellanger, wherein de Bont summarized his efforts to line up meetings with a prominent venture capital firm as a promising investor candidate for Agora.  In his February 6, 2013 email, de Bont suggested that the investment deck should first be presented to Agora's advisor, with a "full pitch" tentatively scheduled for early March 2013 with the venture capital firm.

97.   Bellanger responded to de Bont's February 6, 2013 email approximately one hour later.  In his email, Bellanger noted that he "just chatted" with the son of a "founder partner" at the venture capital firm identified in de Bont's email. According to Bellanger, "I explained [to] them what we are doing, the history of Agora and where we are heading now."  Bellanger added that the partner's son "will totally vouch for us to his dad and the team."  Bellanger further added, "I have

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

started to put my network in action, combined with yours, we will start meetings with a lot of people in the coming weeks."  Bellanger also provided further comments regarding de Bont's efforts and identified certain "next steps."

98.   Before concluding his February 6, 2013 email, Bellanger observed, "[t]he world is small, things are lining up pretty positively, very exciting!"

## Anand and Bellanger Shut Out Hullinger and de Bont

99.   The meetings that were scheduled and planned for March 2013 did not happen for Agora.  Instead, Anand and Bellanger conspired to usurp and misappropriate Agora's opportunities—along with Agora's physical and intellectual property—and re-start Agora under a new name (Prevoty, Inc.) offering substantially the same products and services as Agora, while shutting out Hullinger and de Bont from the business they co-founded.

100.  Out of the blue, on or around February 18, 2013, Anand told Hullinger and de Bont that he would be unilaterally shutting down Agora's email and network, citing his parents' divorce as the primary factor.

101.  On or around February 18, 2013, Anand unilaterally cut-off Hullinger's and de Bont's access to their agorasec.com email accounts and cut-off their access to other documents stored on the agorasec.com network and other shared drives.

102.  As a result of Anand's actions, Hullinger and de Bont had no way of accessing much of Agora's materials.  They also could not communicate through their agorasec.com email accounts.

103.  On October 24, 2014, Anand unilaterally filed a Certificate of Cancellation for Agora with the California Secretary of State.  In the filing with the California Secretary of State, Anand falsely purported to be the sole member of Agora.  In the same document, Anand further represented falsely that the dissolution of Agora "was made by the vote of all of the members."

104.  Anand's statements on the Certificate of Cancellation were materially and willfully false.  Anand was not the sole member of Agora.  Indeed, his statement

to this effect directly contradicts his agreement with Hullinger and de Bont that the three were equal members and co-founders of Agora.  Contrary to his statement, there was no "vote of all of the members" of Agora authorizing dissolution of the LLC.

105.  Anand's statements on the Certificate of Cancellation also suggest that, contrary to his promises and representations in the May 1, 2012 email, Anand did not file a revised Statement of Information or other papers with the California Secretary of State reflecting the true ownership percentages and membership status of Hullinger, de Bont and himself.

106.  Anand did not seek consent from either Hullinger or de Bont to file the Certificate of Cancellation.  Hullinger and de Bont did not consent to any dissolution of Agora, much less Anand's filing of the Certificate of Cancellation.

107.  Anand also did not provide Hullinger or de Bont notice that he was filing the Certificate of Cancellation.

108.  Although purporting to shut down Agora, Anand failed to properly wind up the company.  For example, Anand did not distribute to Agora's members any of the company's remaining assets, including intellectual property, cash assets and other property belonging to Agora.

109.  Anand's filing of the Certificate of Cancellation on behalf of Agora is null and void due to Anand's fraudulent representations to the California Secretary of State.

110.  Anand's filing of the Certificate of Cancellation on behalf of Agora is null and void because, contrary to Anand's misrepresentations, there was no vote of all members of Agora to dissolve.

111.  Anand also embezzled the cash assets of Agora by withdrawing all cash from the Agora bank accounts, without making any distribution to the other members.  Over a period of months, Anand slowly deducted money from the Agora bank accounts.

112.  On or around June 6, 2015, Anand withdrew the remaining balances from Agora's four bank accounts.  A true and correct copy of Anand's last withdrawal confirmation from Agora's main account is attached hereto as Exhibit C.

113.  Anand did not notify Hullinger or de Bont that he was withdrawing funds from Agora's accounts.

114.  Anand also unilaterally closed Agora's bank accounts without notifying Hullinger or de Bont.

115.  Further, neither Hullinger nor de Bont were ever reimbursed for expenses incurred while developing and promoting Agora and its products.

### Anand and Bellanger Created Prevoty and Misappropriated Agora's Intellectual Property

116.  Bellanger and Anand made preparations to exclude Hullinger and de Bont even before Anand shut out his original co-founders from their email accounts and the company's shared drive on February 18, 2013.

117.  Bellanger registered the domain name Prevoty.com on or around February 10, 2013.

118.  On or around March 6, 2013, Bellanger and/or Anand incorporated Prevoty, Inc. ("Prevoty") as a Delaware corporation.  Corporate documents for Prevoty identify Bellanger and Anand as executive officers and directors of the company.  Bellanger is identified as co-founder and CEO of Prevoty on the company's website, while Anand is identified as co-founder and CTO.

119.  Prevoty offers the same or substantially the same security services as Agora.

120.  For example, Prevoty offers security software for minimizing the risks of malicious cross-site scripting and SQL injections, which may compromise user or database information.

121.  In early to mid-2013, Prevoty renamed Agora's "Sandbox" demo as "SmartFilter," and offered the demo on its website for purposes of attracting prospective customers and investors to Prevoty.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

122.   According to Prevoty's website, www.prevoty.com, "Prevoty is a security software company dedicated to protecting users and enterprises by solving the difficult challenges related to application security."  Prevoty's website also states that the company "has developed an application security engine that monitors and protects your applications at runtime[,] . . . .  providing real-time visibility into what threats the applications are actually seeing and the option of transforming or blocking content and database queries so that everything the application processes is safe."

123.   On information and belief, Prevoty uses the same or substantially the same proprietary source code, or a derivation thereof, as the source code developed by Hullinger, de Bont and Anand at Agora.

124.   On information and belief, Prevoty, Anand and Bellanger used the Agora "Sandbox" demo—or a revised version thereof—for Prevoty's business purposes, including attracting investors and/or customers, training new staff and for other purposes.

125.   On information and belief, Prevoty, Anand and Bellanger used the Agora pitch materials and other proprietary materials of Agora for creating investor and customer pitches, training materials and other materials for Prevoty.

126.   On March 15, 2013, Anand filed two patent applications with the United States Patent & Trademark Office (the "PTO"):  U.S. Patent Application No. 13/839,622 (the "'622 Application") entitled "Systems and Methods for Tokenizing User-Generated Content to Enable the Prevention of Attacks" and U.S. Patent Application No. 13/839,807 (the "'807 Application") entitled "Systems and Methods for Parsing User-Generated Content to Prevent Attacks."  Both applications list Anand as the sole inventor.

127.   On August 4, 2015, the '807 Application issued as U.S. Patent Number 9,098,722 (the "'722 Patent"), listing Anand as the sole inventor, with Prevoty as the assignee.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

128.  The '622 Application issued as U.S. Patent No. 9,313,223 (the "'223 Patent") on April 12, 2016, listing Anand as the sole inventor, with Prevoty as the assignee.

129.  Not surprisingly, the systems and methods described in the '722 and '223 Patents mirror the technology developed by Hullinger, de Bont and Anand while they were building and promoting Agora, including the Agora Blue technology and the technology reflected through the Sandbox demo.

130.  The technology underlying Agora Blue is substantially equivalent to the claimed inventions recited in the '722 and '223 Patents, and is the same or substantially similar technology offered by Prevoty today.

131.  The '722 and '223 Patents describe systems and methods to secure user-generated content using tokenization and parsing.  Tokenization is a process by which user-generated content is tagged into defined categories for further security processing.  Parsing is the process of identifying and removing non-standard and malicious content.

132.  The claimed inventions recited in the '722 and '223 Patents were conceived of and developed by Hullinger, de Bont and Anand in their respective roles at Agora, as the company was attempting to productize new modes of application security monitoring.

133.  The claimed inventions of the '722 and '223 Patents belong to Agora. By unilaterally assigning the '622 and '807 Applications to Prevoty, Anand and Prevoty have unlawfully taken possession of these applications and the issued patents, which rightfully belong to Agora.

134.  On information and belief, Anand and Bellanger secretly collaborated to develop Prevoty, a competing business, while still working with Hullinger and de Bont at Agora.

135.  On information and belief, Bellanger and Prevoty encouraged Anand to dissolve and cancel Agora, establish Prevoty and exclude Hullinger and de Bont

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

from the new company in order to exploit the benefits of Hullinger and de Bont's efforts for themselves.

136. On information and belief, Bellanger assisted Anand in incorporating Prevoty and procuring internet space for the new company.

137. As a member/partner and officer of Agora, Anand maintained a position of special trust in the company, and was under a fiduciary duty to assign to Agora any and all intellectual property that was conceived of and developed while at Agora and that related to Agora's business.

## Anand and Bellanger Conspired with Others to Mislead Plaintiffs and Create Prevoty

138. Other individuals and companies also conspired with, aided and abetted Bellanger and Anand in misappropriating Agora's property and shutting out de Bont and Hullinger. These include Defendants McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad.

### Jamie McNiel

139. Defendant Jamie McNiel knowingly and intentionally encouraged, aided and abetted the wrongful conduct alleged herein.

140. McNiel started working with Anand, Hullinger, de Bont and Agora at least as early as February 2012. Among other things, McNiel personally assisted Anand, Hullinger, de Bont, and Agora in creating pitch materials and website materials for Agora. These pitch materials for Agora identified Hullinger, de Bont, and Anand as co-founders of Agora.

141. As a result of his efforts working with Agora since at least February 2012, McNiel was aware that Plaintiffs Hullinger and de Bont were co-founders and co-owners of Agora, and that they contributed to the company's technology. McNiel was also aware that Defendants Anand and Bellanger owed fiduciary duties to Agora, Hullinger and de Bont.

142.  Even so, McNiel actively assisted and conspired with Anand and
Bellanger to re-start Agora as Prevoty, exclude de Bont and Hullinger and
misappropriate Agora's property and technology.

143.  Around January or February 2013, McNiel also knowingly and
intentionally assisted Anand and Bellanger in diverting investment and customers
from Agora to Prevoty.

144.  For example, on February 7, 2013, Anand and Bellanger provided
McNiel with an Agora slide deck.  The slide deck described Agora's product, Agora
Blue, along with Agora's product roadmap, revenue model, and financial
projections.  The slide deck also contained the statement "Founded by Kunal Anand,
Ben de Bont, Julien Bellanger, and Jason Hullinger."  Attached as Exhibit D is a true
and correct copy of non-confidential excerpts from the February 7, 2013 Agora slide
deck.

145.  McNiel helped to divert funds and customers by revising the Agora slide
deck and converting it into a Prevoty slide deck.  Among other things, between
February 7 and 10, 2013, McNiel worked with Anand and Bellanger to change the
Agora slide deck, including by substituting "Agora" with "Prevoty," substituting the
product name "Agora Blue" with "Prevoty Blue," and removing Hullinger and de
Bont's names as co-founders.

146.  For many months after 2013—including in 2014 and 2015—McNiel
continued to assist the other defendants in creating presentations that would divert
funds and customers to Prevoty.  On information and belief, various iterations of
presentations that McNiel worked on were in fact used to raise investment and solicit
customers for Prevoty, to the exclusion of Hullinger, de Bont and Agora.

147.  McNiel also assisted Anand and Bellanger in starting a business
(Prevoty) that competes with Agora, misappropriating Agora's physical and other
property for use by Prevoty, and falsely claiming that Anand and Bellanger were the
founders of the company.

148.  Anand and Bellanger used Agora's property, including the misappropriated slide decks, to solicit investors to invest in Prevoty.

149.  On information and belief, McNiel agreed to aid and abet the other defendants in exchange for expected financial gain, including a promise to receive a significant role in the newly established company.

150.  McNiel has also received equity and/or stock options in Prevoty.

151.  McNiel continued to assist Anand and Bellanger, subsequently becoming a contractor for and eventually an employee at Prevoty, despite his knowledge that Prevoty was simply a reincarnation of Agora.

152.  Plaintiffs had neither knowledge, nor reason to know, that Jamie McNiel was involved in this conduct until December 2015, when McNiel produced documents showing his involvement.

### Michael Stern

153.  Defendant Michael Stern aided, abetted and conspired with the other defendants starting at least as early as January or February 2013.

154.  On information and belief, in January or February of 2013, Stern learned that Bellanger and Anand were involved with Agora.  Around the same time, Stern also learned that Plaintiffs Hullinger and de Bont were also co-founders and co-owners of Agora.

155.  In January or February 2013, Bellanger and, on information and belief, Anand engaged in various discussions with Stern concerning Agora.  Among other things, Stern was involved in discussions concerning Agora's members, technology, potential customers and potential investors.

156.  On February 7, 2013, Bellanger wrote to McNiel concerning Agora's February 7, 2013 pitch deck, with a copy to Anand.  Among other things, Bellanger wrote: "Will catch up with you tonight after getting feedback from our advisor and Kunal."  The referenced "advisor" is Michael Stern.  Attached as Exhibit E is a true

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

and correct copy of the February 7, 2013 email.  As stated earlier, excerpts from the pitch deck attached to the February 7, 2013 email are included herein as Exhibit D.

157.  On or about February 7, 2013, Bellanger and/or Anand provided Stern with a pitch deck for Agora, entitled "AGORA: Trust the Web."  Among other things, the pitch deck included a high-level description of Agora's technology for addressing cross-site scripting, and declared that Agora's product (Agora Blue) removes all cross-site scripting attacks.  The February 7, 2013 pitch deck provided to Stern also declared that "Agora Blue is ready," and included a product road map and certain financial modeling for the company.  The pitch deck provided to Stern also stated that Agora was "Founded by Kunal Anand, Ben de Bont, Julien Bellanger and Jason Hullinger."  The pitch deck also indicated that Agora's technology "is protected by an early patent portfolio."

158.  Stern was aware that Anand and Bellanger owed (and still owe) fiduciary duties to their existing company (Agora), as well as to the company's co-founders (Hullinger and de Bont).

159.  Stern was also aware that Agora was the owner of the patent portfolio and other technology referenced in the pitch deck.

160.  Between February 7 and February 10, 2013, Bellanger met with Stern, and Anand.  During that meeting or possibly earlier, Stern and his co-conspirators concocted a plan to re-start Agora under a new name (*i.e.*, Prevoty), misappropriate Agora's technology and other assets, divert funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

161.  On information and belief, during this same time period, Stern provided substantial encouragement to Bellanger and Anand to execute their plan.

162.  Among other things, Stern provided advice to Bellanger and Anand on positioning the new competing start-up business, reviewed additional investor pitch decks, and on information and belief, advised Anand and Bellanger in their

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

endeavors to re-start Agora under a new name, to the exclusion of Plaintiffs Hullinger and de Bont.

163.  In approximately February 2013, Stern also personally provided much-needed cash to assist Bellanger and Anand in re-starting the company without Hullinger and de Bont.

164.  Stern also introduced Bellanger and Anand to other potential investors, thereby diverting resources and funding to Prevoty and away from Agora.

165.  Bellanger and Anand met with Stern, and on his advice, Bellanger, Anand, Stern and McNiel worked together to further implement their plans for excluding Hullinger and de Bont from Agora.

166.  On or about February 10, 2013, Bellanger, Anand, Stern and McNiel worked together to change all "Agora" references in the pitch deck to "Prevoty." The title changed from "AGORA: Trust the Web" to "PREVOTY: Trust the Web."

167.  The February 10, 2013 pitch deck for Prevoty uses the same high-level language for addressing cross-site scripting, but changes the name of the product from "Agora Blue" to "Prevoty Blue." The pitch deck also indicates that the technology "is protected by an early patent portfolio." Most importantly, the names of de Bont and Hullinger were removed as co-founders. Attached as Exhibit F is a true and correct copy of non-confidential excerpts from the February 10, 2013 Prevoty pitch deck.

168.  With Stern's encouragement, Anand and Bellanger put that plan into action and continued to update Stern as to the progress on that plan. For example, on February 16, 2013, Bellanger wrote Stern, "Kunal has started his divorce from his legacy, it is going as planned for now." Attached as Exhibit G is a document produced by Defendants in the above-caption litigation under bates number DEF008358, which appears to be a February 16, 2013 email from Julien Bellanger to Michael Stern, containing the quoted language.

169.  Around the time Anand and Bellanger incorporated Prevoty, Stern contributed investment capital to further assist Prevoty.  On March 3, 2013, Bellanger wrote Stern, "Thanks for all your help and your cash!"  Attached as Exhibit H is a document produced by Defendants in the above-caption litigation under bates number DEF009634, which appears to be a March 3, 2013 email from Julien Bellanger to Michael Stern, containing the quoted language.

170.  After the formation of Prevoty, Stern continued to provide advice and assistance as a Growth Advisor for Prevoty.

171.  Stern agreed to aid and abet the other defendants in exchange for expected financial gain.  Among other things, Stern received compensation, including in the form of debt and/or equity in Prevoty, in exchange for assisting the other defendants with the misconduct alleged herein.

172.  Plaintiffs had neither knowledge, nor reason to know, that Michael Stern was involved in this conduct until early 2016, when Defendant Bellanger identified Stern in an interrogatory response and Defendants produced documents showing Mr. Stern's involvement.  Mr. Stern has also stipulated that he would not argue prejudice or unreasonable delay pending production of documents by Mr. Stern and the other subpoenaed investors that are represented by the same counsel.

<u>Adam Lilling and His Related Companies</u>

173.  Defendant Adam Lilling, along with Plus Capital, Plus Ventures TMG, and Plus Ventures Gee aided, abetted and conspired with the other defendants starting at least as early as January or February 2013.

174.   Defendant Adam Lilling is the Founder and Managing Partner/ Managing Director of Plus Capital, Plus Ventures TMG and Plus Ventures.

175.   Defendant Adam Lilling is also a co-founder of Defendant Launchpad LA.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

176.  On information and belief, Plus Ventures TMG and Plus Ventures are also venture capital funds based in Santa Monica or Los Angeles, California.  On information and belief, Plus Ventures TMG is also an incubator for startups.

177.  On and information and belief, Plus Ventures TMG, Plus Ventures and Plus Capital are all affiliates of one another, and all three funds are alter egos of one another and of Defendant Adam Lilling.  On information and belief, in January 2013, Lilling learned that Bellanger and Anand were involved with Agora.  Around the same time, Lilling also learned that Plaintiffs Hullinger and de Bont were co-founders and co-owners of Agora.

178.  In January and February 2013, Bellanger and Anand engaged in various discussions with Lilling concerning Agora.  Among other things, Lilling was involved in discussions concerning Agora's members, technology, potential customers and potential investors.

179.  In or around January 2013, Lilling introduced Bellanger and Agora to David Young, a partner at the law firm of Cooley LLP, as a candidate for providing Agora legal assistance with corporate and intellectual property matters.  As explained above, Cooley provided a proposal to Bellanger for representing Agora.  Bellanger forwarded that proposal to Hullinger, de Bont and Anand on February 6, 2013, with a recommendation that Agora should engage Cooley.

180.  On information and belief, in January or February 2013, Bellanger provided Lilling and Young a pitch deck for Agora.  Among other things, the pitch deck included a high-level description of Agora's technology for addressing cross-site scripting, and declared that Agora's product (Agora Blue) removes all cross-site scripting attacks.  The Agora pitch deck provided to Lilling and Young also indicated that Agora Blue is ready for deployment, and included a product road map and certain financial modeling for the company.  The pitch deck provided to Lilling and Young also indicated that Agora's technology is protected by an early patent

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

portfolio, and stated that Agora was founded by Kunal Anand, Ben de Bont, Julien Bellanger and Jason Hullinger.

181.   Lilling was aware that Anand and Bellanger owed (and still owe) fiduciary duties to their existing company (Agora), as well as to the company's co-founders (Hullinger and de Bont).

182.   Lilling was also aware that Agora was the owner of the patent portfolio and other technology referenced in the pitch deck.

183.   On information and belief, at some point in early to mid February 2013, Lilling joined his co-conspirators' plan to re-start Agora under a new name (*i.e.*, Prevoty), misappropriate Agora's technology and other assets, divert funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

184.   Lilling provided advice to Bellanger and Anand on positioning the new competing start-up business and became a Growth Advisor for the company.

185.   In approximately February 2013, Lilling also personally provided much-needed cash to assist Bellanger and Anand re-start the company without Hullinger and de Bont.

186.   In approximately February or March 2013, Lilling personally introduced Bellanger and Anand to other potential investors—including Paige Craig and Launchpad LA—thereby diverting resources and funding to Prevoty and away from Agora.

187.   Lilling served as the initial lead investor for Prevoty's December 2013 investment round, which enabled Prevoty to continue and extend the wrongful conduct alleged herein.

188.   Lilling also committed additional funds into Prevoty in the March 2015 Series A funding round through his investment vehicles, Plus Capital, L.P., Plus Ventures Gee, GP, and Plus Ventures TMG I, LLC.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

189. Lilling agreed to aid and abet the other defendants in exchange for expected financial gain. Among other things, Lilling received compensation, including in the form of debt and/or equity in Prevoty, in exchange for assisting the other defendants with the misconduct alleged herein.

190. Plaintiffs had neither knowledge, nor reason to know, that Lilling was involved in this conduct until early 2016, when Defendants produced documents showing Lilling's involvement. Lilling also stipulated that he would not argue prejudice or unreasonable delay pending production of documents by Lilling and the other subpoenaed investors that are represented by the same counsel.

<u>Dan Kaminsky</u>

191. Defendant Dan Kaminsky knowingly and intentionally encouraged, aided and abetted the wrongful conduct alleged herein.

192. At least as early as May 2012, Kaminsky offered to serve—and did in fact serve—as an advisor to Agora. In this role, Kaminsky interacted directly with all three of Agora's co-founders, including Plaintiffs Hullinger and de Bont.

193. Kaminsky understood and acknowledged Hullinger and de Bont's roles and involvement in Agora and knew that Anand was not working alone. Indeed, Kaminsky acknowledged Hullinger and de Bont's roles with Agora in person at a Black Hat conference on or about July 2012.

194. In December 2012, Kaminsky introduced Anand to a potential customer about using Agora's technology. In doing so, Kaminsky communicated with Anand using Anand's Agora email account.

195. In February 2013, Defendant Bellanger informed the Kaminsky-introduced customer that Agora had become Prevoty. In particular, on February 27, 2013, Bellanger sent an email entitled "Agora => Prevoty" to the prospective customer, and stated, "Kunal and I just raised our first round of financing and incorporated our company under a new name: Prevoty." In doing so, Bellanger confirms that Prevoty is simply Agora under a new name. A redacted (for

confidentiality) copy of the February 27, 2013 communication (including its email chain) is attached herein as Exhibit I.

196.  On information and belief, Kaminsky was aware that Defendants Anand, Bellanger and Prevoty, along with other co-conspirators, were engaged in an on-going fraud to re-start Agora under a new name (*i.e.*, Prevoty), misappropriate Agora's technology and other assets, divert funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

197.  Even so, in or around February or March 2013, Kaminsky switched from serving as an Agora advisor to serving as a Prevoty advisor.

198.  Starting in or around February or March 2013, Kaminsky also provided advice to Bellanger and Anand on positioning Prevoty as a competing start-up business, reviewed investor pitch decks, and on information and belief, advised Anand and Bellanger in their endeavors to re-start Agora under a new name, to the exclusion of Plaintiffs Hullinger and de Bont.

199.  Kaminsky also became a Technical Advisor to Prevoty sometime in 2013.

200.  Kaminsky was aware that Anand and Bellanger owed (and still owe) fiduciary duties to Plaintiffs Agora, Hullinger and de Bont.

201.  Kaminsky was aware that Prevoty's technology, patents, trade secrets and other intellectual property were (and still are) owned by Agora.  Kaminsky was aware that Plaintiffs Hullinger and de Bont were involved in developing the Agora technology.  Among other things, Kaminsky was aware of this through his work with Agora in 2012.

202.  Starting in February or March 2013, Kaminsky encouraged, aided and abetted Defendants Anand, Bellanger and Prevoty in misappropriating Agora's trade secrets.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

203. Kaminsky also helped introduce Defendants Anand, Bellanger and Prevoty to other potential investors and customers, diverting funding and revenue from Agora to Prevoty.

204. Starting in February or March of 2013, Kaminsky lent his name and reputation to back Prevoty. Kaminsky is well known by name and reputation in software security circles.

205. Kaminsky agreed to aid and abet the other defendants in exchange for expected financial gain. Among other things, Kaminsky received compensation, including in the form of stock options in Prevoty, in exchange for assisting the other defendants with the misconduct alleged herein.

206. Plaintiffs had neither knowledge, nor reason to know, that Dan Kaminsky was involved with Prevoty at all until approximately July 2014, when Mr. Kaminsky appeared on Prevoty's website as an advisor.

<u>U.S. Venture Partners and USVP XI</u>

207. Defendants Bellanger, Anand and Prevoty solicited U.S. Venture Partners to aid and abet their wrongdoing at least as early as May 2013.

208. U.S. Venture Partners is an early stage venture capital firm based in Silicon Valley.

209. Accordingly to publicly available information, U.S. Venture Partners raised approximately $300 million for USVP XI, which is U.S. Venture Partners' early-stage venture capital fund.

210. On and information and belief, U.S. Venture Partners is an affiliate, general partner and alter ego of USVP XI.

211. Representatives from U.S. Venture Partners met with Defendants Bellanger and Anand at least as early as May 3, 2013.

212. On or about May 6, 2013, Bellanger sent U.S. Venture Partners representatives (including Jacques Benkoski, John Hadl and Steve Krausz) a White Paper on the SmartFilter—which was developed at Agora.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

213.  Early on, USVP knew that—on the day it was founded—Prevoty already had a multi-million-dollar valuation,  key patent applications forming the backbone of its technology, fully-developed source code, and existing customer relationships.

214.  On or about September 27, 2013, Bellanger sent U.S. Venture Partners representatives an Investor Deck for Prevoty—which was based upon earlier Investor Decks created for Agora.

215.  On information and belief, Bellanger also met with U.S. Venture Partners representative Dafina Toncheva in or around May 2014.

216.  On or about September 11, 2014, Bellanger sent U.S. Venture Partners representative Dafina Toncheva further information concerning Prevoty's technology and products—which were derived from Agora's technology and products.

217.  From approximately fall of 2014 through spring of 2015, USVP conducted extensive due diligence with respect to Prevoty, including both business and legal due diligence.

218.  As part of its due diligence, USVP interviewed many of Prevoty's past and current customers, interviewed personal references for Anand and Bellanger, and engaged in detailed discussions with Prevoty's board members.

219.  On or about January 19, 2015, USVP partners Dafina Toncheva and Steve Krausz presented the Prevoty deal to the larger USVP partnership.  On information and belief, the USVP partners approved a proposed Term Sheet for Prevoty shortly thereafter.

220.  On or about February 2-3, 2015, USVP (acting through Steve Krausz) and Prevoty (acting through Bellanger) executed a non-binding Term Sheet for a Series A Preferred Stock issue.

221.  USVP continued and intensified its due diligence after executing the non-binding Term Sheet with Prevoty on February 2-3, 2015.  Among other things,

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

USVP and its lawyers engaged in lengthy negotiations with Prevoty and its counsel, including David Levine of Harrell Levine, and received and reviewed key documents as part of that diligence effort.

222. As part of its diligence efforts, USVP learned that the intellectual property forming the backbone of Prevoty's technology and product offerings was actually created at Agora—long before Prevoty was established. USVP received and reviewed documents showing that Agora has a claim to the intellectual property of Prevoty. USVP also received and reviewed documents confirming that Bellanger and Anand did not and could not have created the technology and underlying intellectual property outside of their work at Agora. USVP learned that Prevoty's technology and intellectual property actually belongs to Agora.

223. As part of its diligence efforts, USVP learned that Hullinger, de Bont and Anand were all co-founders, co-owners and members of Agora. USVP received and reviewed documents confirming that Anand is CEO of Agora. On information and belief, as part of its diligence efforts, USVP also learned that Plaintiffs Hullinger and de Bont are the CTO and COO, respectively, for Agora.

224. Much of the diligence efforts of USVP involved reviewing documents made available for inspection by Prevoty's counsel.

225. Documents confirming Hullinger and de Bont's ownership and position with Agora were in the files of Prevoty's counsel, who had obligations to provide those documents to USVP. As part of its diligence efforts, USVP had access to and inspected documents and other information identifying Plaintiffs Hullinger and de Bont as owners and members of Agora. Exhibit J is one such document that was in the files of Prevoty's counsel as of February 2013 and was made available to USVP in connection with its due diligence.

226. As part of its diligence efforts, USVP learned that Anand and Bellanger owed (and still owe) fiduciary duties to Plaintiffs Agora, Hullinger and de Bont, and that they have breached (and are still breaching) those duties.

227.  On information and belief, as part of its diligence efforts, USVP encouraged Anand, Bellanger and/or Prevoty to move forward with a purported dissolution of Agora and a purported cancellation of its Articles of Organization. The timing of Defendants' purported cancellation of Agora's Articles of Organization coincides with USVP's intensive diligence efforts.

228.  On information and belief, as part of its diligence efforts, USVP learned that Defendants Anand, Bellanger and Prevoty, along with other co-conspirators, were engaged in an on-going fraud to re-start Agora under a new name (*i.e.*, Prevoty), misappropriate Agora's technology and other assets, divert funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

229.  USVP knowingly aided, abetted and facilitated the continued fraud, breach of fiduciary duties, misappropriation of trade secrets and other wrongful conduct of Anand, Bellanger, Prevoty and their other co-conspirators.

230.  On or about March 6, 2015, U.S. Venture Partners agreed to provide Prevoty a significant investment, using USVP XI as the investment vehicle.  On information and belief, USVP transferred this sum to Prevoty via wire transfer on or about March 6, 2015.  As part of the same agreement, others, including Lilling and Karlin, agreed to invest additional significant amounts.  Based upon publicly available information, the USVP-led Series A round provided approximately $8 million in funding based upon a pre-investment valuation of approximately $24 million, and generating a post-investment valuation of approximately $32 million for Prevoty.

231.  The investment provided by USVP and others that followed USVP enabled Anand, Bellanger and Prevoty to continue engaging in the wrongful conduct alleged herein.  Acting through Krausz and Toncheva, USVP continues to encourage, aid and abet Anand, Bellanger and Prevoty to engage in this misconduct.

232.  On or about September 8, 2015, Plaintiffs informed USVP that Anand, Bellanger and Agora were engaged in an on-going fraud, breach of fiduciary duties, misappropriation of trade secrets and other wrongdoing.  Plaintiffs also informed USVP that the technology and other intellectual property of Prevoty actually belongs to Agora.  Plaintiffs provided USVP with irrefutable evidence to support their claims, including the May 1, 2012 email.  Plaintiffs also invited USVP to investigate and offered to provide additional supporting materials.

233.  Even after they received further detailed notification from Plaintiffs, on information and belief USVP declined to take any remedial actions.  Instead, USVP continued to support, aid and abet the wrongdoing alleged herein.

234.  As late as March 2016, USVP supported, aided and abetted Defendants, Prevoty, Anand and Bellanger by promoting them as part of the "USVP CEO Conference Israel 2016."

235.  USVP agreed to aid and abet the other defendants in exchange for expected financial gain.  Among other things, USVP received compensation, including in the form of equity in Prevoty, in exchange for assisting the other defendants with the misconduct alleged herein.

236.  Plaintiffs had neither knowledge, nor reason to know, that USVP was involved with Prevoty until March 2015, when Prevoty announced the Series A investment round led by USVP, and did not know that USVP was involved in the misconduct alleged herein until after documents were produced in connection with this litigation.  USVP has also stipulated that it would not argue prejudice or unreasonable delay pending production of documents by USVP and the other subpoenaed investors that are represented by the same counsel.

<u>Karlin</u>

237.  Karlin took steps to aid and abet the wrongdoing alleged herein at least as early as May 2013.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

238.  According to its website (www.karlinvc.com), "Karlin Ventures is an early-stage venture capital fund based in Los Angeles."  Karlin seeks to invest $100,000 to $1 million per investment.

239.  According to Karlin's press materials, Karlin is the early stage investment division of Karlin Asset Management, LLC.  Karlin Management, LLC manages over $1.4 billion of unleveraged capital.  Karlin is an affiliate and alter ego of Karlin Asset Management, LLC.

240.  Mr. Tianxiang "TX" Zhuo is the managing partner of Karlin.

241.  Karlin started its diligence with respect to an investment in Prevoty at least as early as May 2013.

242.  Karlin's due diligence with respect to Prevoty included both business and legal due diligence.

243.  Early on, Karlin knew that—on the day it was founded—Prevoty already had a multi-million-dollar valuation,  key patent applications forming the backbone of its technology, fully-developed  source code, and existing customer relationships.

244.  Karlin's diligence efforts were led by Karlin representatives Tianxiang "TX" Zhuo and Arteen Arabshahi.

245.  Karlin representatives (including Zhuo) met with Defendants Anand and Bellanger at least as early as May 14, 2013.

246.  Karlin also started supporting, aiding and abetting Defendants Anand, Bellanger and Prevoty at least as early as May 2013.

247.  For example, on or about May 22, 2013, Karlin representative Arteen Arabshahi introduced Defendants Bellanger, Anand and Prevoty to the co-founder and Chief Product Officer at a large and reputable online dating and social media company.  In doing so, Karlin's Arabshahi specifically highlighted some of the Agora technology that was misappropriated by Prevoty.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

1     248.   In or around June 2013, Defendant Bellanger confirmed to Prevoty's

2     advisors and investors (including Lilling, Stern and Kaminsky) that Karlin has

3     "hinted that they would like to invest in our existing note or a later one."

4     249.   Throughout the summer and fall of 2013, Karlin representatives

5     facilitated extensive favorable introductions to potential customers and investors—

6     thereby helping to divert potential investment and revenue from Agora to Prevoty.

7     These included introductions to additional individuals at large social media, private

8     equity and entertainment companies, among others.

9     250.   On or about August 22, 2013, Karlin representative Zhuo informed

10    Prevoty's investors at Launchpad LA: "Met with Julien today and told him I would

11    invest [a specified sum] for sure on a convertible note if the cap is $8M or less and

12    consider investing up to an additional [specified sum] subject to further diligence."

13    251.   In early December 2013, Karlin agreed to provide Prevoty with a

14    significant investment, and Karlin transferred that sum to Prevoty via wire transfer

15    on or about December 4, 2013.

16    252.   Throughout 2014, Karlin representatives offered further support,

17    encouragement and assistance to Defendants Prevoty, Anand and Bellanger.  Among

18    other things, Karlin representatives facilitated extensive favorable introductions to

19    potential customers and investors—thereby helping to divert potential investment

20    and revenue from Agora to Prevoty.  These included introductions to additional

21    individuals at large eCommerce, healthcare, entertainment, private equity, and

22    educational institutions, as well as an introduction to a multi-national on-demand

23    transportation network company, among others.

24    253.   In 2014, Karlin also assisted in recruiting employees for Prevoty.

25    254.   In 2014, Karlin provided general encouragement and consulted on

26    business strategies for Prevoty.

27

28

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

255.  On information and belief, Karlin conducted further diligence with respect to Prevoty in late 2014 and early 2015, including diligence related to a possible additional investment in the company.

256.  In March 2015, Karlin agreed to provide Prevoty a further significant investment, and Karlin wired that sum to Prevoty shortly thereafter.

257.  Karlin continued to provide assistance and encouragement to Defendants Prevoty, Anand and Bellanger throughout 2015.

258.  In or around May 2015, Karlin invited Defendants Prevoty, Anand and Bellanger to participate in a conference, where they would be introduced to Chief Information Officers of potential clients.  On May 4, 2015, Karlin representative Zhuo wrote to Defendant Bellanger, "We're stacking the deck for our portfolio companies and putting you in the same group as the following CIOs for the team building challenges: Hulu, Ticketmaster, eHarmony."

259.  In the spring and summer of 2015, Karlin representatives also facilitated additional favorable introductions to potential customers and investors—thereby helping to divert potential investment and revenue from Agora to Prevoty.  These included introductions to additional  officers and partners in the private equity space, as well as individuals at a multi-national technology company and a large American talent and sports agency, among others.

260.  During this time period, Karlin representatives were specifically assisting Defendants Prevoty, Bellanger and Anand to locate potential investors who would be interested in participating in a Series B investment round.  For example, on or about June 17, 2015, Karlin representative Zhuo wrote to Defendants Bellanger and Anand: "I know you guys are not looking for money but [a specified partner] and his team head up the security platform at [a specified private equity firm] and they are very interested in getting to know you guys for the next round."

261.  On information and belief, as part of its diligence efforts, Karlin representatives interviewed Prevoty's past and current customers, interviewed

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

personal references for Anand and Bellanger, and engaged in discussions with Prevoty's board members.  On information and belief, Karlin representative Arabshahi also received information from a former Prevoty employee who previously helped Agora connect with prospective customers.

262.  As part of its diligence efforts, Karlin learned that the intellectual property forming the backbone of Prevoty's technology and product offerings was actually created at Agora—long before Prevoty was established.  Karlin received and reviewed documents showing that Agora has a claim to the intellectual property of Prevoty.  Karlin also received and reviewed documents confirming that Bellanger and Anand did not and could not have created the technology and underlying intellectual property outside of their work at Agora.  Karlin learned that Prevoty's technology and intellectual property actually belongs to Agora.

263.  As part of its diligence efforts, Karlin learned that Hullinger, de Bont and Anand were all co-founders, co-owners and members of Agora.  Karlin received and reviewed documents confirming that Anand is CEO of Agora.  On information and belief, as part of its diligence efforts, Karlin also learned that Plaintiffs Hullinger and de Bont are the CTO and COO, respectively, for Agora.

264.  Much of the diligence efforts of Karlin involved reviewing documents made available for inspection by Prevoty's counsel.

265.   Documents confirming Hullinger and de Bont's ownership and position with Agora were in the files of Prevoty's counsel, who had obligations to provide those documents to Karlin.  As part of its diligence efforts, Karlin had access to and inspected documents and other information identifying Plaintiffs Hullinger and de Bont as owners and members of Agora, including the document attached herein as Exhibit J.

266.  As part of its diligence efforts, Karlin learned that Anand and Bellanger owed (and still owe) fiduciary duties to Plaintiffs Agora, Hullinger and de Bont, and that they had breached (and are still breaching) those duties.

267.   As part of its diligence efforts, Karlin learned that Defendants Anand, Bellanger and Agora, along with other co-conspirators, were engaged in an on-going fraud to re-start Agora under a new name (*i.e.*, Prevoty), misappropriate Agora's technology and other assets, divert funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

268.   Karlin knowingly aided, abetted and facilitated the continued fraud, breach of fiduciary duties, misappropriation of trade secrets and other wrongful conduct of Anand, Bellanger, Prevoty and their other co-conspirators.

269.   The investments provided by Karlin and others enabled Anand, Bellanger and Prevoty to continue engaging in the wrongful conduct alleged herein. Karlin continues to encourage, aid and abet Anand, Bellanger and Prevoty to engage in this misconduct.

270.   On or about September 8, 2015, Plaintiffs informed Karlin that Anand, Bellanger and Agora were engaged in an on-going fraud, breach of fiduciary duties, misappropriation of trade secrets and other wrongdoing.  Plaintiffs also informed Karlin that the technology and other intellectual property of Prevoty actually belong to Agora.  Plaintiffs provided Karlin with irrefutable evidence to support their claims, including the May 1, 2012 email.  Plaintiffs also invited Karlin to investigate and offered to provide additional supporting materials.

271.   Even after they received further detailed notification from Plaintiffs, on information and belief Karlin declined to take any remedial actions.  Instead, Karlin continues to support, aid and abet the wrongdoing alleged herein.

272.   For example, in or around November 2015, Karlin invited Defendants Prevoty, Anand and Bellanger to participate in the "LA First Look Retreat" sponsored by Karlin.  In doing so, Karlin further encouraged, facilitated, aided and abetted the on-going wrongful conduct alleged herein.

273.   As recently as January 2016, Karlin representative Zhuo has continued to support and encourage the wrongful conduct alleged herein.  On or about January

14, 2016, Zhuo published an article characterizing Defendant Prevoty as one of three "thriving startups which I believe will form the pillars of cyber security in the future." Zhuo further supported Prevoty by adding the following: "Take Prevoty for example, organizations these days run multiple applications and the number will continue to grow. Instead of having a one size fits all security solution, organizations now need tailored security platform for each of their applications. Guiding the CSO to understand the problem, its magnitude and how your platform will fix that is what Prevoty does well."

274.  Karlin agreed to aid and abet the other defendants in exchange for expected financial gain.  Among other things, Karlin received compensation, including in the form of equity in Prevoty, in exchange for assisting the other defendants with the misconduct alleged herein.

275.  Plaintiffs had neither knowledge, nor reason to know, that Karlin was involved with Prevoty until December 2013, when Prevoty announced an investment round involving Karlin, and did not know that Karlin was involved in the misconduct alleged herein until after documents were produced in connection with this litigation.  Karlin also stipulated that it would not argue prejudice or unreasonable delay pending production of documents by Karlin and the other subpoenaed investors that are represented by the same counsel.

Launchpad

276.  Launchpad took steps to aid and abet the wrongdoing alleged herein at least as early as February 2013.

277.  On its website (www.launchpadla.com), Launchpad LA touts itself as "the top startup accelerator in Southern California."  According to its website, Launchpad LA offers "each accepted company $25k - $100k, free office space in the heart of Santa Monica (one block from the beach) for four months, a ton of perks and discounts, and most importantly, access to a massive network of mentors, advisors, and investors."

278.  According to its website, Launchpad LA looks "for companies that have more than a Powerpoint and less than a Series A."  Launchpad LA "need[s] to see at least the first iteration of something [the company has] made, whether it's a site, app, or other product."  According to its website, Launchpad LA "will never accept two competing companies in the same class."  According to its website, the Cooley law firm is a sponsor (among others) of Launchpad LA, and Launchpad LA works closely with its sponsors.

279.  On and information and belief, Defendant Launchpad LA is a general partner, affiliate and alter ego of Launchpad II.

280.  Defendant Adam Lilling is a mentor, advisor, co-founder and otherwise affiliated with Launchpad LA.

281.  In addition to their prior relationship with Adam Lilling, Defendants Anand and Bellanger were first introduced to other Launchpad representatives (including Sam Teller) at least as early as the first half of February 2013.

282.  On information and belief, Anand and/or Bellanger met in person with Launchpad representatives (likely Sam Teller) on or about February 15, 2013.  At this time, Anand and Bellanger were still working with Hullinger and de Bont at Agora.

283.  In addition to Adam Lilling's diligence, Launchpad started its diligence with respect to a possible investment in Agora and/or Prevoty at least as early as the first half of February 2013.

284.  Launchpad's efforts in this regard were led by Sam Teller.

285.  In early March 2013, Launchpad representatives, including Sam Teller, reached an agreement with Defendants Anand and Bellanger to incubate Prevoty.  Among other things, Launchpad agreed to provide Defendants Anand, Bellanger and Prevoty with cash and office space, to arrange introductions to prospective investors and customers, and to provide business and technical advice.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

286.  As part of its diligence and negotiations, Launchpad also hired outside counsel, including attorneys Nick Hobson and Dave Young from the Cooley law firm in Los Angeles.

287.  Launchpad conducted further diligence and negotiations with Defendants Anand and Bellanger in April 2013, including through their respective counsel.

288.  Starting in March or April 2013 and for many months thereafter, Launchpad facilitated introductions for Anand and Bellanger to prospective investors and customers, often while knowingly touting the technology that was created at Agora, including by Hullinger and de Bont.

289.  Among other things, Launchpad facilitated introductions to U.S. Venture Partners and Karlin.

290.  Launchpad formalized its equity relationship with Prevoty on or about May 13, 2013.  In exchange for incubating Prevoty, providing cash, office space and other support, Launchpad received equity in Prevoty.  The equity is held by Launchpad II.

291.  Launchpad provided office space for Prevoty, on information and belief, from approximately March 2013 through approximately October 2, 2013.

292.  On information and belief, Launchpad was aware of Agora, including Hullinger and Anand's relationship with the company, at least as early as sometime between January and March 2013.

293.  As early as February 2013, Launchpad's attorneys had an Agora pitch deck referencing Hullinger and Anand as founders of Agora.  In February 2013, Defendants Bellanger and/or Anand informed Launchpad's attorneys that Agora was changing its name to Prevoty.

294.  As part of its discussions and diligence efforts, Launchpad learned that the intellectual property forming the backbone of Prevoty's technology and product offerings was actually created at Agora—long before Prevoty was established.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

Launchpad received and reviewed documents showing that Agora has a claim to the intellectual property of Prevoty.  Launchpad also received and reviewed documents confirming that Bellanger and Anand did not and could not have created the technology and underlying intellectual property outside of their work at Agora. Launchpad learned that Prevoty's technology and intellectual property actually belongs to Agora.

295.  Documents confirming Hullinger and de Bont's ownership and position with Agora were also in the files of Prevoty's counsel, who had obligations to provide those documents to Launchpad.  As part of its diligence efforts, Launchpad would have received and analyzed—and on information and belief Launchpad did receive and analyze—documents and other information identifying Plaintiffs Hullinger and de Bont as owners and members of Agora, including the document attached herein as Exhibit J.

296.  As part of its diligence efforts, Launchpad (including Sam Teller and Adam Lilling) learned that Anand and Bellanger owed (and still owe) fiduciary duties to Plaintiffs Agora, Hullinger and de Bont, and that they had breached (and are still breaching) those duties.

297.  As part of its diligence efforts, Launchpad (including Sam Teller and Adam Lilling) learned that Defendants Anand, Bellanger and Agora, along with other co-conspirators, were engaged in an on-going fraud to re-start Agora under a new name (i.e., Prevoty), misappropriate Agora's technology and other assets, divert funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

298.  Launchpad knowingly aided, abetted and facilitated the continued fraud, breach of fiduciary duties, misappropriation of trade secrets and other wrongful conduct of Anand, Bellanger, Prevoty and their other co-conspirators.

1    299.  The office space, investment, introductions and other assistance and encouragement provided by Launchpad and others enabled Anand, Bellanger and Prevoty to engage and continue engaging in the wrongful conduct alleged herein.

300.  Launchpad agreed to aid and abet the other defendants in exchange for expected financial gain.  Among other things, Launchpad received compensation, including in the form of equity in Prevoty, in exchange for assisting the other defendants with the misconduct alleged herein.

301.  Plaintiffs had neither knowledge, nor reason to know, that Launchpad was involved with Prevoty until mid-2013, and did not know that Launchpad was involved in the misconduct alleged herein until after documents were produced in connection with this litigation.  Launchpad also stipulated that it would not argue prejudice or unreasonable delay pending production of documents by Launchpad and the other subpoenaed investors that are represented by the same counsel.

### Defendants Diverted Millions of
### Dollars in Investment from Agora to Prevoty

302.  Defendants' unlawful use of Agora's intellectual property and proprietary information has allowed Prevoty to divert a substantial amount of investor funding away from Agora by capitalizing on the substantial effort and goodwill that Hullinger and de Bont contributed to Agora.  For example, following Anand's purported dissolution and cancellation of Agora and his patent assignments to Prevoty, Prevoty received at least between $630,000 and $700,000 by April 2013 in a Series Seed funding round, approximately $2,150,000 by March 2014 in a Series Seed Extension funding round, and approximately $8,000,000 by March 2015 in a Series A funding round from investment firms.

303.  By the end of March 2013, less than a month after Prevoty was formed, Prevoty closed on approximately $250,000 in funding from investors, including a significant investment from Stern.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

304.  By the end of April 2013, Prevoty closed on approximately $385,000 in additional funding from other investors, including a significant investment from Lilling.

305.  By around April 2013, Prevoty secured at least between $630,000 and $700,000 through its Series Seed funding round.

306.  By December 2013, less than ten months after Prevoty's formation, Prevoty closed approximately $1.7M in additional investor funding through a Series Seed Extension funding round, including a significant investment from Karlin and a further significant investment from Lilling.

307.  Around March 2014, Prevoty secured an investment of approximately $400,000 in funding through cash contributions of new executive hires.

308.  Around March 2015, Prevoty closed a Series A funding round that raised approximately $8M in investor funding, the majority of which was financed by USVP.  The Series A funding round also included further significant investments from Lilling and Karlin.

309.  To date, Prevoty has raised approximately $11M in funding as a result of Anand, Bellanger and Prevoty's unlawful use of Agora's intellectual property and proprietary information.

## FIRST CAUSE OF ACTION

### (Nullification of Agora's Certificate of Cancellation)

310.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

311.  Hullinger, de Bont and Anand associated to carry on, as co-owners, a business for profit.  Hullinger, de Bont and Anand initially operated their business under the names Sphinx Systems, Agora Systems and/or Agora Security, but ultimately in or around mid February 2012, they orally and/or implicitly agreed to register their business as a California limited liability company under the name Agora Systems LLC.

312.  Agora was duly registered as a limited liability company with the California Secretary of State on or around February 22, 2012.

313.  Anand, Hullinger and de Bont agreed that each of them was an equal member of Agora with an equal one-third ownership interest in Agora.

314.  Agora's Articles of Organization need not and do not identify the membership of Agora, nor were any other documents filed simultaneously with the Secretary of State identifying the membership of the LLC.

315.  To the extent Anand somehow registered himself as the sole shareholder of Agora, Anand held two-thirds of the ownership interest in a trust for the benefit of Hullinger and de Bont.

316.  Anand's May 1, 2012 email to Hullinger and de Bont also explicitly confirms that Anand, Hullinger and de Bont each hold a one-third ownership interest as co-founders and members of Agora.

317.  On October 24, 2014, Anand filed with the California Secretary of State a fraudulent Certificate of Cancellation purporting to dissolve and cancel Agora as a California LLC.

318.  Anand included materially false factual representations in the October 24, 2014 Certificate of Cancellation, including false representations that the dissolution was authorized by a vote of all of the members and that he was the "sole member" of Agora.

319.  Anand did not have authorization to unilaterally dissolve or cancel Agora as a California LLC, and his submission of the Certificate of Cancellation to the California Secretary of State on behalf of Agora was fraudulent.

320.  Agora has never been wound up.  Any cancellation of the limited liability company was also improper for that reason.

321.  There was never a membership vote authorizing the dissolution, much less cancellation, of Agora.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

322.  In approving the Certificate of Cancellation for Agora, the California Secretary of State relied upon the fraudulent information submitted in Anand's Certificate of Cancellation.

323.  The fraudulent Certificate of Cancellation filed by Anand should be declared a nullity and set aside for fraud, including without limitation under California Civil Code § 3412.

324.  To the extent necessary, Plaintiffs request a judicial order for the reinstatement of Agora as a California limited liability company, including without limitation under California Government Code §§ 12261(b) and/or 12261(c).

325.  To the extent that Agora is not found to subsist (either as a limited liability company or a partnership), Plaintiffs Hullinger and de Bont raise their claims asserted herein as former owners of Agora and partners with Anand, and seek their pro rata share of damages.

326.  Plaintiffs also seek a declaration that Ben de Bont and Jason Hullinger were, are and continue to be members of Agora.

## SECOND CAUSE OF ACTION

**(Wrongful Dissolution and/or Cancellation of Agora, Against Defendant Anand)**

327.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

328.  Hullinger, de Bont and Anand associated to carry on, as co-owners, a business for profit.  Hullinger, de Bont and Anand initially operated their business under the names Sphinx Systems, Agora Systems and/or Agora Security, but ultimately in or around mid February 2012, they orally and/or implicitly agreed to register their business as a California limited liability company under the name Agora Systems LLC.

329.  Agora was duly registered as a limited liability company with the California Secretary of State on or around February 22, 2012.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

330.  Anand, Hullinger and de Bont orally agreed in or around February 2012 that each of them was an equal member of Agora with an equal one-third ownership interest in Agora.

331.  Anand's May 1, 2012 email to Hullinger and de Bont also explicitly confirmed that Anand, Hullinger and de Bont would each hold a one-third ownership interest as co-founders and members of Agora.

332.  Anand wrongfully purported to dissolve and/or cancel Agora when he unilaterally and fraudulently filed a Certificate of Cancellation with the Secretary of State on October 24, 2014, falsely listing himself as Agora's sole member.

333.  The Certificate of Cancellation filed by Anand also purports to dissolve Agora, falsely representing that "[t]he dissolution was made by the vote of all of the members."

334.  Anand has wrongfully purported to dissolve and/or cancel Agora.  As a result, Anand should lose his right to participate in management as a member and a manager of the LLC, thereby forfeiting any and all authority previously vested in him with respect to Agora, including without limitation under California Corporations Code § 17704.07.

## THIRD CAUSE OF ACTION

### (Judicial Order to Expel Defendants Anand and Bellanger from Agora)

335.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

336.  Hullinger, de Bont and Anand associated to carry on, as co-owners, a business for profit.  Hullinger, de Bont and Anand initially operated their business under the names Sphinx Systems, Agora Systems and/or Agora Security, but ultimately in or around mid February 2012, they orally and/or implicitly agreed to register their business as a California limited liability company under the name Agora Systems LLC.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

337.  Agora was duly registered as a limited liability company with the California Secretary of State on or around February 22, 2012.

338.  Anand, Hullinger and de Bont are each equal members of Agora with an equal one-third ownership interest in Agora.

339.  Anand's May 1, 2012 email to Hullinger and de Bont also explicitly confirms that Anand, Hullinger and de Bont each hold a one-third ownership interest as co-founders and members of Agora.

340.  Anand began to include Bellanger in the company's strategic decisions in early 2013.

341.  Anand and Bellanger have engaged and continue to engage in wrongful conduct that has adversely and materially affected Agora's activities.

342.  Anand and Bellanger have engaged and continue to engage in conduct relating to Agora's activities that make it not reasonably practicable to carry on activities with Hullinger and/or de Bont as members, co-owners and/or partners of Agora.

343.  Anand should be expelled from Agora by judicial order, including without limitation under Cal. Corp. Code §§ 17706.02(e) and/or 16601(5).

344.  Bellanger was never a member, partner and/or co-owner of Agora.

345.  Bellanger and Anand, however, have created documents identifying Bellanger as a co-founder of Agora and have otherwise referred to Bellanger as a co-founder of Agora, including in pitch decks such as the one attached herein as Exhibit D.  Accordingly, there is an actual justiciable case and controversy with regards to Bellanger's membership interest in Agora.

346.  Accordingly, Plaintiffs seek a declaration that Bellanger was not and is not a member of Agora.

347.  To the extent Bellanger contends that he is or was a member, partner and/or co-owner of Agora, Bellanger should be expelled from Agora by judicial

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

order, including without limitation under Cal. Corp. Code §§ 17706.02(e) and/or 16601(5).

## FOURTH CAUSE OF ACTION

### (Correction of Inventorship, 35 U.S.C. § 256)

348.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

349.  Hullinger, de Bont and Anand jointly conceived of and/or contributed to the inventions claimed in the '722 and '223 Patents.

350.  Hullinger, de Bont and Anand are co-inventors of the claimed subject matter in the '722 and '223 Patents.

351.  Hullinger and de Bont were omitted as named inventors on the '722 and '223 Patents without any fraud on their part.

352.  Inventorship on the '722 and '223 Patents should be corrected under 35 U.S.C. § 256 to reflect Hullinger and de Bont as named inventors.  Hullinger and de Bont are entitled to a judgment that both are inventors of the inventions claimed in the '722 and '223 Patents.

## FIFTH CAUSE OF ACTION

### (Breach of Fiduciary Duty, Against Defendants Anand and Bellanger)

353.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

354.  Agora was duly registered as a limited liability company with the California Secretary of State on or around February 22, 2012.

355.  Anand, Hullinger and de Bont orally agreed in or around February 2012 that each of them was an equal member of Agora with an equal one-third ownership interest in Agora.

356.  Anand's May 1, 2012 email to Hullinger and de Bont also explicitly confirms that Anand, Hullinger and de Bont each hold a one-third ownership interest as co-founders and members of Agora.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

357.  Hullinger, de Bont and Anand collaborated to develop Agora and its software technology.  Each member of the team contributed substantially to Agora's development as a company, including, but not limited to, development and optimization of Agora's technology, reaching out to prospective investors and pitching Agora's technology to a number of potential customers.

358.  Agora was a member-managed LLC, and Anand was a managing member of Agora.

359.  Anand held the title of CEO of Agora.  Anand held himself out as CEO of Agora.

360.  As a managing member and CEO of Agora, a partner of Hullinger and de Bont, and (to the extent applicable) as a trustee holding stock for the benefit of Hullinger and de Bont, Anand owed Plaintiffs fiduciary duties of loyalty and care.

361.  By virtue of these fiduciary duties, Anand was required to act in the utmost good faith towards Plaintiffs and to avoid acts and omissions adverse to Plaintiffs' business interests.

362.  Anand breached his fiduciary duties to Agora, Hullinger and de Bont by *inter alia* (a) starting a competing business, namely Prevoty; (b) unilaterally shutting down business operations under the name Agora; (c) shutting out Hullinger and de Bont from their Agora emails and other documents hosted on the agorasec.com network; (d) falsely claiming to be the sole member of Agora; (e) falsely claiming that the members of Agora had voted for dissolution; (f) unilaterally filing a Certificate of Cancellation for Agora; (g) promising to file paperwork with the California Secretary of State identifying Hullinger and de Bont as equal members and co-founders of Agora, and representing that he had done so, when Anand had never filed such papers and had no intention of doing so; (h) abandoning Agora's business efforts in the midst of on-going efforts to secure contracts with potential customers and investors; (i) usurping Agora's corporate opportunities by diverting Agora's prospective investor funding and customer opportunities to Prevoty; (j)

failing to assign intellectual property rights, including in the '722 and '223 Patents, as well as in International Application No. PCT/US14/30076, U.S. Application No. 14/599,975, International Application No. PCT/US15/12078, U.S. Application No. 14/599,978, International Application No. PCT/US15/12082 and any related applications or patents to Agora; (k) failing to name Hullinger and de Bont as inventors on the '722 and '223 Patents and related applications (including pending applications in the same family); (l) assigning (or purporting to assign) Agora's intellectual property rights to Prevoty, despite obligations to assign the intellectual property rights to Agora; (m) misappropriating Agora's physical and other property for use by a competing company; (n) soliciting investment and customers for a competing company; (o) acting as CTO of a competing company; (p) failing to disclose the conduct described above, which created a conflict of interest for Anand; (q) conspiring with others to commit the wrongful conduct described herein; (r) embezzling money from Agora, including unilaterally emptying the company's bank accounts and keeping the withdrawn cash for himself; (s) failing to wind up Agora and distribute remaining assets to the other members after unilaterally purporting to dissolve and/or cancel the company; and (t) other wrongful conduct.

363. As a member, managing member and CEO of Agora, as a partner of Hullinger and de Bont, and (to the extent applicable) as a trustee holding stock for the benefit of Hullinger and de Bont, Anand had a fiduciary duty to apprise Hullinger and de Bont of any corporate opportunity before seizing it. Anand, however, kept Prevoty a secret from Hullinger and de Bont in order to reap the benefits of Agora to the exclusion of Plaintiffs.

364. On information and belief, Anand knowingly and willfully performed all the aforementioned activities to enrich and benefit himself financially and otherwise at Plaintiffs' expense.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

365.  As a result of Anand's breach of his fiduciary duties, Plaintiffs have been irreparably injured and have suffered significant monetary damages in an amount to be proven at trial.

366.  By taking on a role to act on behalf of and/or for the benefit of Hullinger, de Bont and Anand and for the benefit of Agora as set forth above, Bellanger also undertook fiduciary obligations to Agora and its members/partners, including Hullinger and de Bont.

367.  Bellanger breached his fiduciary duties to Agora, Hullinger and de Bont by *inter alia* (a) starting a competing business, namely Prevoty; (b) misappropriating Agora's physical and other property for use by a competing company; (c) usurping Agora's corporate opportunities by soliciting investment and customers for his competing company (Prevoty); (d) acting as CEO of a competing company; (e) failing to disclose the conduct described above, which created a conflict of interest for Bellanger; (f) conspiring with Anand and others to commit the wrongful conduct described above; and (g) other wrongful conduct.

368.  As a result of Bellanger's breach of his fiduciary duties, Plaintiffs have been irreparably injured and have suffered significant monetary damages in an amount to be proven at trial.

369.  Defendants have also acted with fraud, oppression and/or malice. Accordingly, Plaintiffs also seek an award of punitive and special damages.

## SIXTH CAUSE OF ACTION

### (Declaratory Judgment of Agora's Ownership of Intellectual Property, Against Defendants Anand and Prevoty)

370.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

371.  As a member, managing member and CEO of Agora, Anand had a fiduciary duty to assign to Agora any and all patents, copyrights and other intellectual property developed in connection with his work for Agora that relates to Agora's business.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

372.  Hullinger, de Bont and Anand jointly conceived of and/or contributed to the inventions claimed in the '722 and '223 Patents and related applications (including pending applications in the same family).  Each had a duty to assign his interest in the patent and application to Agora.

373.  In violation of his fiduciary duties to Agora, Hullinger and de Bont, Anand purported to assign his entire interest in the '722 and '223 Patents and related applications (including pending applications in the same family) to Prevoty, a competitor of Agora.

374.  Anand's purported assignments of the entire interest in the '722 and '223 Patents and related applications (including pending applications in the same family) to Prevoty are void because (1) Anand was only one of three co-inventors of the claimed inventions, and (2) Anand was under a fiduciary obligation to assign his intellectual property rights to Agora, as described above.

375.  Agora is the rightful owner of all rights and interest in the '722 and '223 Patents, as well as any U.S. or foreign applications or issued patents claiming priority therefrom or relating thereto.  To the extent necessary, Anand and/or Prevoty should be enjoined to assign all such rights and title to Agora.

## SEVENTH CAUSE OF ACTION

**(Accounting and Ownership of Prevoty Stock and Other Moneys and Property, Against Defendants Anand, Bellanger, Prevoty and Any Other Defendant(s) Claiming an Interest)**

376.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

377.  As a managing member and CEO of Agora, a partner of Hullinger and de Bont, and (to the extent applicable) as a trustee holding stock for the benefit of Hullinger and de Bont, Anand had a fiduciary duty to refrain from competing with Agora and to refrain from seizing for himself opportunities that rightfully belong to the company.  Anand further had a fiduciary duty to account to Agora and its members, his partners and the trust beneficiaries for any property, any profit or

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

benefit derived by Anand in the conduct of Agora's business, or through use of Agora's property or information, including through the appropriation of any company opportunities.

378. By taking on a role to act on behalf of and/or for the benefit of Hullinger, de Bont and Anand and for the benefit of Agora as set forth above, Bellanger also undertook fiduciary obligations to Agora and its members/partners, including Hullinger and de Bont.

379. In violation of these fiduciary duties, Anand and Bellanger conspired to: create a new company (Prevoty) that competes directly with Agora; shut down Agora's business operations and shut out Hullinger and de Bont from Agora's business operations; convert and misappropriate Agora's physical and intellectual property, as well as confidential information, for the benefit of the new company; and misappropriate customer and investment opportunities—all at the expense of Agora and its other members.

380. Defendants McNiel, Stern, Kaminsky, Lilling, USVP, Karlin and Launchpad aided and abetted these breaches.

381. Agora, Hullinger and de Bont are entitled to an accounting and recovery of all property, profit or benefit derived through use of Agora's property or information, including through the appropriation of any company opportunities, including without limitation (a) all stock and other equity of Prevoty, (b) all salaries, bonuses, profits and other benefits received by Defendants Prevoty, Anand and/or Bellanger, (c) all moneys and other consideration received as investments by Defendants Prevoty, Anand and/or Bellanger, and (d) any other property, profit or benefit derived through the conduct of Prevoty, or through use of Agora's property or information, or through the appropriation of any of Agora's opportunities.

382. Plaintiffs seek the imposition of a constructive trust, against Prevoty, Anand, Bellanger and any other person or entity claiming to hold stock or stock options of Prevoty, for the benefit of Agora and/or Hullinger and de Bont, with

respect to (a) all stock and other equity of Prevoty, (b) all salaries, bonuses, profits and other benefits received by Defendants Prevoty, Anand and/or Bellanger, (c) all moneys and other consideration received as investments by Defendants Prevoty, Anand and/or Bellanger, and (d) any other property, profit or benefit derived through the conduct of Prevoty, or through use of Agora's property or information, or through the appropriation of any of Agora's opportunities.  Plaintiffs are entitled to each of these items of property.  The defendants gained and acquired this property through fraud and other wrongful conduct.

## EIGHTH CAUSE OF ACTION

**(Aiding and Abetting Breach of a Fiduciary Duty, Against Defendants Anand, Bellanger, Prevoty, McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad)**

383.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

384.  Bellanger and Anand each assisted the other in breaching his fiduciary duties owed to Plaintiffs.

385.  Bellanger was aware of Anand's fiduciary duties to Plaintiffs, including Anand's role as a managing member and CEO of Agora, partner to Hullinger and de Bont and/or trustee holding stock for the benefit of Hullinger and de Bont. Accordingly, Bellanger was on notice as to Anand's fiduciary duties owed to Agora and its other members.

386.  Anand was also aware of Bellanger's role with Agora, as Anand had introduced Bellanger to Plaintiffs and provided him with access to Agora's confidential and proprietary materials.  Accordingly, Anand was also on notice as to Bellanger's fiduciary duties owed to Agora and its members.

387.  Bellanger took concrete steps to facilitate Anand's breach of his fiduciary duties.  Among other things, Bellanger registered the domain name Prevoty.com, assisted Anand in setting up a competing company, agreed to act as CEO of the new company, consented to Anand's role as CTO of the new competing

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

company, and aided and facilitated Anand's misappropriation and conversion of property and opportunities belonging to Agora, Hullinger and de Bont.  Bellanger also serves as Prevoty's Agent for Service of Process in California.

388.  On information and belief, Bellanger encouraged Anand to shut out Hullinger and de Bont from Agora and to form Prevoty without them.

389.  Bellanger and Anand secretly collaborated to develop and establish Prevoty while working at Agora, while withholding such information from Hullinger and de Bont.

390.  Anand also took concrete steps to facilitate Bellanger's breach of his fiduciary duties.  Among other things, Anand facilitated Bellanger's access to confidential and proprietary materials at Agora, assisted Bellanger in incorporating a competing business, agreed to act as CTO of the new company, consented to Bellanger's role as CEO of the new competing company, and aided and facilitated the misappropriation and conversion of property and opportunities belonging to Agora, Hullinger and de Bont.

391.  On information and belief, Anand and Bellanger willingly performed the above actions having knowledge of the other's fiduciary duties to Plaintiffs.

392.  On information and belief, Anand and Bellanger also acted in the name of and for the benefit of Prevoty in aiding and abetting the aforementioned breaches of fiduciary duties.  Acting through its agents, Prevoty was aware of the fiduciary duties owed by Anand and Bellanger to Plaintiffs.  On information and belief, Prevoty aided and facilitated Anand's and Bellanger's misappropriation and conversion of property and corporate opportunities belonging to Agora, Hullinger and de Bont, including without limitation customer and investment opportunities.

393.  Each of Defendants McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) also assisted and encouraged Bellanger and Anand in breaching their fiduciary duties owed to Plaintiffs.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

394.  Each of Defendants McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) had actual knowledge that Defendants Anand and Bellanger breached—and are continuing to breach—their fiduciary duties to Plaintiffs Hullinger, de Bont and Agora.

395.  Each of McNiel, Stern, Lilling and Kaminsky was aware of Bellanger and Anand's fiduciary duties to each of the Plaintiffs.

396.  McNiel and Kaminsky directly interacted with Hullinger and de Bont in their roles as Agora co-founders.

397.  McNiel personally reviewed and edited Investor decks identifying Hullinger and de Bont (along with Anand and Bellanger) as co-founders of Agora.

398.  On information and belief, each of Stern, Lilling and Kaminsky also reviewed and edited Investor decks identifying Hullinger and de Bont as co-founders of Agora.

399.  Stern helped to create a plan to re-start Agora as Prevoty without Hullinger and de Bont.  Bellanger and Anand provided Stern with progress reports regarding implementation of the plan.

400.  Each of McNiel, Stern, Lilling and Kaminsky was aware that Anand was Agora's CEO and that Bellanger held himself out as a co-founder of Agora, along with Hullinger, de Bont and Anand.

401.  Each of McNiel, Stern, Lilling and Kaminsky was also aware that Bellanger took upon himself the responsibility to act on behalf of and/or for the benefit of Hullinger, de Bont, and Agora.

402.  Each of McNiel, Stern, Lilling and Kaminsky was aware that Bellanger and Anand have breached their fiduciary duties owed to each of the Plaintiffs.

403.  Each of McNiel, Stern, Lilling and Kaminsky was aware that Anand and Bellanger breached and continue to breach their fiduciary duties to Plaintiffs, including by (a) starting a competing business, namely Prevoty; (b) shutting out Hullinger and de Bont from Agora; (c) falsely claiming that Anand was the sole

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

member of Agora; (d) converting the Agora pitch decks intro Prevoty pitch decks while removing Hullinger and de Bont as co-founders; (e) abandoning Agora's business efforts in the midst of on-going efforts to secure contracts with potential customers and investors; (f) usurping Agora's corporate opportunities by diverting Agora's prospective investor funding and customer opportunities to Prevoty; (g) misappropriating Agora's physical and other property for use by a competing company; (h) soliciting investment and customers for a competing company; (i) acting as CTO and CEO, respectively, of a competing company; (j) failing to disclose the conduct described above to Hullinger or de Bont; (k) conspiring with others to commit the wrongful conduct described herein; (l) committing other wrongful conduct.

404.  Each of McNiel, Stern, Lilling and Kaminsky was also aware that Anand breached and continues to breach his fiduciary duties to Plaintiffs, by also (m) assigning intellectual property rights, including in the '722 and '223 Patents, as well as in International Application No. PCT/US14/30076, U.S. Application No. 14/599,975, International Application No. PCT/US15/12078, U.S. Application No. 14/599,978, International Application No. PCT/US15/12082), and any related applications or patents, to Prevoty instead of Agora; and (n) failing to name Hullinger and de Bont as inventors on the '722 and '223 Patents and related applications.

405.  Each of McNiel, Stern, Lilling and Kaminsky provided substantial assistance and encouragement to Anand and Bellanger.

406.  Each of McNiel, Stern, Lilling and Kaminsky actively assisted and/or encouraged Anand and Bellanger to re-start Agora as Prevoty, exclude de Bont and Hullinger and misappropriate the property and technology of Agora.

407.  Each of McNiel, Stern, Lilling and Kaminsky also knowingly and intentionally assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.

408.  Each of McNiel, Stern, Lilling and Kaminsky helped Anand and Bellanger start a competing business (Prevoty) to the exclusion of Hullinger and de Bont.

409.  Each of Stern and Lilling provided financial assistance to Anand and Bellanger in breaching their fiduciary duties.

410.  Each of Stern, Lilling and Kaminsky provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to secure investment and generate revenues for Prevoty.

411.  Each of Stern, Lilling and Kaminsky provided advice to Bellanger and Anand on positioning a competing start-up business and reviewed investor pitch decks.  Each of Stern, Lilling and Kaminsky provided business and/or technical advice, helping and encouraging Anand and Bellanger to commit acts that breached and continue to breach their fiduciary duties to Plaintiffs.

412.  Each of Stern, Lilling and Kaminsky lent his name and reputation to back Prevoty.  Kaminsky is well known by name and reputation in software security circles, whereas Stern and Lilling are well known by name and reputation in the investment community.

413.  McNiel personally assisted Anand and Bellanger in converting Agora slide decks to Prevoty slide decks for use by Anand and Bellanger to secure investments and opportunities for Prevoty.  McNiel also provided services in-kind for Prevoty.  McNiel's assistance was critical in accomplishing the breaches alleged herein and a substantial factor in causing Plaintiffs' damages.

414.  Stern personally conspired with Bellanger and Anand to concoct a plan for shutting out Hullinger and de Bont and re-forming Agora as Prevoty.

415.  Each of Karlin, USVP and Launchpad (including Teller) was also aware of Bellanger and Anand's fiduciary duties to each of the Plaintiffs.  Each of Karlin, USVP and Launchpad (including Teller) knew that Anand was CEO of Agora.  On information and belief, each of Karlin, USVP and Launchpad (including Teller)

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

knew that Hullinger and de Bont were co-founders and members of Agora.  On information and belief, each of Karlin, USVP and Launchpad (including Teller) was also aware that Bellanger took upon himself the responsibility to act on behalf of and/or for the benefit of Hullinger, de Bont and Agora.

416.  Each of USVP and Karlin was aware that Anand and Bellanger breached and continue to breach their fiduciary duties to Plaintiffs, including by (a) starting a competing business, namely Prevoty; (b) shutting out Hullinger and de Bont from Agora; (c) falsely claiming that Anand was the sole member of Agora; (d) usurping Agora's corporate opportunities by diverting Agora's prospective investor funding and customer opportunities to Prevoty; (e) misappropriating Agora's physical and other property for use by a competing company; (f) soliciting investment and customers for a competing company; (g) acting as CTO and CEO, respectively, of a competing company; (h) falsely claiming that the members of Agora had voted for dissolution; (i) unilaterally filing a Certificate of Cancellation for Agora; and (j) committing other wrongful conduct.

417.  Each of USVP and Karlin was also aware that Anand breached and continues to breach his fiduciary duties to Plaintiffs, by also (k) assigning intellectual property rights, including in the '722 and '223 Patents, as well as in International Application No. PCT/US14/30076, U.S. Application No. 14/599,975, International Application No. PCT/US15/12078, U.S. Application No. 14/599,978, International Application No. PCT/US15/12082 and any related applications or patents, as well any other patents in the same field, to Prevoty instead of Agora; (l) failing to name Hullinger and de Bont as inventors on the '722 and '223 Patents and related applications.

418.  Launchpad (including Sam Teller and Adam Lilling) was aware that Anand and Bellanger breached and continue to breach their fiduciary duties to Plaintiffs, including by (a) starting a competing business, namely Prevoty; (b) shutting out Hullinger and de Bont from Agora; (c) falsely claiming that Anand was

the sole member of Agora; (d) usurping Agora's corporate opportunities by diverting Agora's prospective investor funding and customer opportunities to Prevoty; (e) misappropriating Agora's physical and other property for use by a competing company; (f) soliciting investment and customers for a competing company; (g) acting as CTO and CEO, respectively, of a competing company; and (h) committing other wrongful conduct.

419. Each of USVP, Karlin and Launchpad (including Sam Teller and Adam Lilling) provided substantial assistance and encouragement to Anand and Bellanger during the course of their wrongdoing.

420. Each of USVP, Karlin and Launchpad (led by Teller) provided much-needed financial assistance to Anand and Bellanger to help them in their continuing breaches of their fiduciary duties.

421. Each of USVP, Karlin and Launchpad (including Sam Teller and Adam Lilling) provided Anand and Bellanger with introductions to additional investors and encouraged those other investors to provide further funding, thereby helping to divert investment from Agora and exacerbating the breaches of fiduciary duties against Plaintiffs.

422. Each of USVP, Karlin and Launchpad (including Sam Teller and Adam Lilling) provided business advice and encouragement to Anand and Bellanger to commit acts that breached and continue to breach their fiduciary duties owed to Plaintiffs.

423. On information and belief, each of USVP and Karlin encouraged Anand and Bellanger to submit materials purporting to dissolve Agora and cancel its Articles of Organization.

424. Each of USVP and Karlin continued to provide Anand and Bellanger with support and encouragement even after Plaintiffs provided extensive information and a draft Complaint detailing Anand and Bellanger's breaches. On information and belief, even after receiving detailed information, Karlin and USVP failed to

conduct any meaningful investigation or to take remedial action but, instead, simply forwarded the allegations to the primary wrongdoers (Anand and Bellanger).

425.  Launchpad (led by Teller) provided office space and other office resources to enable Defendants Prevoty, Anand and Bellanger to commit the wrongdoing alleged herein.

426.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad was aware of the breaches of fiduciary duties and intended that they should occur.

427.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad acted with the intent to participate in the ongoing breaches of fiduciary duties by Anand and Bellanger for the purpose of assisting them in performing the acts constituting the breaches.

428.  The assistance provided by each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad was a substantial factor enabling the breaches alleged herein and a substantial factor in causing Plaintiffs' damages.As a result of Anand, Bellanger, Prevoty, McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad's aiding and abetting of the breaches of fiduciary duties owed to Plaintiffs, Plaintiffs have suffered and continue to suffer significant damage in an amount to be proven at trial.

429.  Each of Defendants Anand, Bellanger, Prevoty, McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) has also acted with fraud, oppression and/or malice.  Accordingly, Plaintiffs also seek an award of punitive and special damages.

## NINTH CAUSE OF ACTION

### (Fraud, Against Defendants Anand, Bellanger and Prevoty)

430.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

431.  Agora was duly registered as a limited liability company with the California Secretary of State on or around February 22, 2012.

432.  Anand, Hullinger and de Bont orally agreed in or around February 2012 that each of them was an equal member of Agora with an equal one-third ownership interest in Agora.

433.  On March 30, 2012, Anand filed Agora's Statement of Information with the California Secretary of State, identifying himself as the sole managing member of Agora.

434.  On May 1, 2012, Anand sent Hullinger and de Bont an email representing that the "LLC has been amended" to include both of them as co-founders.  In the May 1, 2012 email, Anand represented that the "revised Statement of Information document has been sent to the State of California."

435.  On October 24, 2014, Anand unilaterally filed a Certificate of Cancellation for Agora with the California Secretary of State.  In the filing with the California Secretary of State, Anand purported to be the sole member of Agora.  In the same document, Anand further represented that the dissolution of Agora "was made by the vote of all of the members."

436.  Based upon Anand's statements in the Certificate of Cancellation, it appears likely that Anand's statements in his May 1, 2012 email were false, and that Anand never sent any revised Statement of Information to the California Secretary of State.

437.  On information and belief, all such representations regarding Agora's LLC documents were false at the time they were made and were known to be false by Anand at such times.

438.  Plaintiffs, however, did not discover the falsity of these statements until they obtained Agora's corporate records from the California Secretary of State in the summer of 2015.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

439.  Up through and including approximately February 18, 2013, Anand continued to treat Hullinger and de Bont as equal co-owners of Agora.

440.  Plaintiffs had no reason to doubt the veracity of Anand's representations, and no reason to investigate, until Hullinger and de Bont were shut out of Agora's network in February 2013, and discovered Prevoty's existence in 2013.

441.  Moreover, by virtue of their fiduciary relationships with Plaintiffs, Anand and Bellanger had a duty to inform Plaintiffs that they were developing and creating a competing business.

442.  Anand and Bellanger conspired to create a new corporate form to the exclusion of Hullinger and de Bont even before February 18, 2013, when Anand locked out Hullinger and de Bont from their agorasec.com accounts.

443.  Anand and Bellanger failed to disclose material information to Hullinger and de Bont regarding their plans to form Prevoty, a competing company.

444.  Anand and Bellanger failed to disclose material information to Hullinger and de Bont regarding their use of Agora materials, such as pitch materials, the Sandbox and other documents, to attract customers and investors in Prevoty in lieu of Agora.

445.  On information and belief, all such omissions were material at the time they were omitted and were known to be material by Anand and Bellanger at such times.

446.  On information and belief, Anand's and Bellanger's fraudulent representations and omissions were made with the intent to defraud Hullinger and de Bont and to induce Hullinger and de Bont to rely on such representations to continue developing Agora and its software technology, to continue improving Agora's materials, and to continue providing introductions to potential inventors and customers, so that Anand and Bellanger may benefit from Hullinger's and de Bont's efforts and contributions.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

447.  Hullinger and de Bont justifiably relied on the material information, or lack thereof, provided by Anand and Bellanger.

448.  Hullinger and de Bont had no reason to believe or suspect that Anand had failed to file a corrected Statement of Information or otherwise correct the paperwork relating to Hullinger's and de Bont's legal membership in Agora.

449.  Hullinger and de Bont had no reason to suspect that Anand and Bellanger were secretly conspiring to develop and establish a competing company while actively promoting Agora's business and technology.

450.  Hullinger and de Bont have suffered significant and irreparable damages as a result of Anand's and Bellanger's fraudulent misrepresentations and omissions and request compensatory and punitive damages in an amount to be proven at trial.

451.  Plaintiffs have also suffered significant and irreparable damages as a result of Anand's fraudulent representations to the Secretary of State.

452.  Anand's statements in the Certificate of Cancellation are false.  Even if Anand never revised the Statement of Information, Hullinger and de Bont were legally members and owners of Agora by virtue of their oral agreement in or around February 2012.  Anand was not the "sole member" of the LLC, nor had the members taken a vote to dissolve or cancel the LLC.

453.  To the detriment of Plaintiffs, the Secretary of State reasonably relied on Anand's false statements in accepting the false Certificate of Cancellation from Anand.

454.  On information and belief, beginning in February 2013, Anand and Bellanger were also acting on behalf of and for the benefit of Defendant Prevoty in committing the fraud described above.

455.  Starting in approximately January or February 2013, Anand and Bellanger mutually and surreptitiously agreed and planned—either orally, in writing and/or implicitly through their actions—to undertake the fraudulent actions described above against Plaintiffs.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

456.  Each of Anand, Bellanger and (beginning in early 2013) Prevoty was aware of the other's wrongful conduct in furtherance of their plans to commit fraud, and intended that such fraud should occur.  Accordingly, each of Anand, Bellanger and Prevoty is responsible and liable for any harm caused by the other co-conspirator.

457.  Plaintiffs seek damages in an amount to be proven at trial.

458.  Each of Defendants Anand, Bellanger and Prevoty has also acted with fraud, oppression and/or malice.  Accordingly, Plaintiffs also seek an award of punitive and special damages.

## TENTH CAUSE OF ACTION

### (Conspiracy to Commit Fraud, Against Defendants Stern, Lilling, McNiel and Kaminsky)

459.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

460.  In January or February of 2013, Defendants Stern, Lilling and McNiel joined the conspiracy to defraud Plaintiffs.

461.  In February of 2013, each of Stern, Lilling and McNiel agreed with Bellanger and/or Anand, that Bellanger and Anand would re-start Agora under a new name (*i.e.*, Prevoty), misappropriate Agora's technology and other assets, divert funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

462.  Each of Stern, Lilling, and McNiel was aware that Plaintiffs Hullinger and de Bont viewed themselves as co-founders and co-owners of Agora based upon representations from Anand and/or Bellanger.  Each of Stern, Lilling and McNiel was also aware that Hullinger and de Bont contributed to Agora's technology, that the technology was subject to an early patent portfolio, and that the Agora Blue product was available in December 2012.

463.  In 2012 and 2013, McNiel personally reviewed and edited Agora pitch decks identifying Hullinger and de Bont as co-founders of Agora, announcing that

"Agora Blue is ready," highlighting a product road map and certain financial modeling for Agora, and noting that Agora's technology "is protected by an early patent portfolio."

464. On information and belief, each of Stern and Lilling also personally reviewed similar Agora decks with substantially the same information, including decks identifying Hullinger and de Bont as co-founders of Agora.

465. On information and belief, in or around January or February 2013, each of Stern and Lilling was aware that Anand misled Plaintiffs Hullinger and de Bont with regard to the paperwork that he filed for Agora with the Secretary of State. On information and belief, each of Stern and Lilling was also aware that Plaintiffs Hullinger and de Bont were working as part of the LLC in reliance on Anand's representations.

466. Each of Defendants Stern, Lilling and McNiel was aware that Anand and Bellanger had a confidential and fiduciary relationship with each of Plaintiffs Hullinger, de Bont and Agora.

467. Each of Stern, Lilling and McNiel was aware that Anand and Bellanger were starting a new company in the same field as Agora, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont. Each of Stern, Lilling and McNiel was also aware that Bellanger and Anand were re-starting Agora under a different corporate name, to the exclusion of Hullinger and de Bont, and without telling Hullinger or de Bont. Each of Stern, Lilling and McNiel was also aware that Anand and Bellanger were using and intending to use Agora's materials and technology for a competing business, without telling Hullinger or de Bont. Each of Stern, Lilling and McNiel was also aware that Anand and Bellanger owed a duty to disclose these material facts to Plaintiffs Hullinger, de Bont and Agora. On information and belief, each of Stern, Lilling and McNiel agreed to actively conceal these material facts from Plaintiffs Hullinger, de Bont and Agora.

468. Each of Stern, Lilling and McNiel was also aware that Hullinger and de

Bont permitted Bellanger to access Agora's technology and other confidential information based upon representations that Bellanger would be assisting Agora. Each of Stern and Lilling was also aware that Hullinger and de Bont involved Bellanger in client pitches, investor pitches, and solicitation of legal counsel based on the same representations.

469.  On information and belief, each of Stern, Lilling and McNiel was also aware in February 2013 that Anand told Hullinger and de Bont that he needed to exit Agora because of his parents' divorce.

470.  Each of the co-conspirators agreed to further Anand, Bellanger, and Prevoty's fraud, and facilitated the fraud by providing material support in the form of encouragement, assistance, and/or funding.

471.  Among other things, starting in January or February 2013, Stern helped his co-conspirators come up with a plan for re-starting Agora as Prevoty, to the exclusion of Hullinger and de Bont.  On information and belief, between February 7 and 10, 2013, Stern was influential in persuading Bellanger and Anand to re-start Agora under a new name without Hullinger and de Bont.  Stern provided seed money for the new company, as well as introductions to other potential investors. On February 16, 2013, Bellanger wrote Stern, "Kunal has started his divorce from his legacy, it is going as planned for now."

472.  Among other things, starting in January or February 2013, Lilling also helped his co-conspirators come up with a plan for re-starting Agora as Prevoty, to the exclusion of Hullinger and de Bont.  Lilling also provided seed money for the new company, as well as introductions to other potential investors.  Lilling provided advice to Bellanger and Anand on positioning the new competing start-up business and became a Growth Advisor for the company.  On information and belief, Lilling also helped Bellanger, Anand and Prevoty misappropriate Agora's technology and other assets and divert funding and customers to Prevoty instead of Agora.  Lilling served as the initial lead investor for Prevoty's December 2013 investment round.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

Lilling also committed additional funds into Prevoty in the March 2015 Series A funding round.

473.  Among other things, starting around February 7, 2013, McNiel personally helped Bellanger and Anand convert the Agora investor pitch into a Prevoty investor pitch.  Starting in February 2013, McNiel also helped his co-conspirators take product designs that were created by Hullinger, de Bont and Agora, and convert them into product designs for Prevoty.  McNiel also helped direct potential investors and customers away from Agora to Prevoty.

474.  On information and belief, Kaminsky also joined the conspiracy sometime around February or March 2013, when he agreed to serve as an advisor for Prevoty instead of Agora, and helped divert funding and customers to Prevoty instead of Agora.

475.  Kaminsky was aware that Plaintiffs Hullinger and de Bont viewed themselves as co-founders and co-owners of Agora.  Kaminsky was also aware that Hullinger and de Bont contributed to Agora's technology, and that the Agora Blue product was available as early as December 2012.  Indeed, Kaminsky personally introduced Agora to prospective customers in 2012.

476.  Kaminsky was also aware that Anand and Bellanger had a confidential and fiduciary relationship with each of Plaintiffs Hullinger, de Bont and Agora.  Kaminsky was aware that Anand and Bellanger were starting a new company in the same field as Agora, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont.  Kaminsky was also aware that Bellanger and Anand were re-starting Agora under a different corporate name, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont.  Kaminsky was also aware that Anand and Bellanger were using and intending to use Agora's materials and technology for a competing business, without telling Hullinger or de Bont.  Kaminsky was also aware that Anand and Bellanger owed a duty to disclose these material facts to Plaintiffs Hullinger, de Bont and Agora.  On information and belief, Kaminsky

agreed to actively conceal these material facts from Plaintiffs Hullinger, de Bont and Agora.

477.  Kaminsky agreed to further Anand's, Bellanger's, and Prevoty's fraud, and facilitated the fraud by providing material support in the form of encouragement and assistance.

478.  Among other things, starting in February or March 2013, Kaminsky provided advice to Bellanger and Anand on positioning the new competing start-up business and became a Growth Advisor and technical advisor for Prevoty.  On information and belief, Kaminsky also helped Bellanger, Anand and Prevoty misappropriate Agora's technology.  Kaminsky also helped introduce Defendants Anand, Bellanger and Prevoty to other potential investors and customers, diverting funding and revenue from Agora to Prevoty.  Kaminsky also lent his name and reputation to back Prevoty, including on pitch decks for Prevoty.

479.  Each of Defendants Stern, Lilling, McNiel and Kaminsky was aware of the fraud against Plaintiffs and intended that such fraud should occur.

480.  Accordingly, each of Stern, Lilling, McNiel and Kaminsky is responsible and liable for any harm caused by the other co-conspirator.

481.  Plaintiffs seek damages in an amount to be proven at trial.

482.  Each of Defendants Stern, Lilling, McNiel and Kaminsky has also acted with fraud, oppression and/or malice.  Accordingly, Plaintiffs also seek an award of punitive and special damages.

## ELEVENTH CAUSE OF ACTION

### (Aiding and Abetting a Fraud, Against Defendants Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad)

483.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

484.  Each of Defendants McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) had actual knowledge of the continuing fraud perpetrated by Defendants Bellanger, Anand and Prevoty.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

485. McNiel was aware of the following:

    a.  At least as early as February 2012, McNiel was aware that Plaintiffs Hullinger and de Bont were co-founders and co-owners of Agora.

    b.  At least as early as 2012, McNiel was aware that Plaintiffs Hullinger and de Bont worked as part of the Agora team in reliance on Anand's representations.

    c.  At least as early as February 2013, McNiel was aware that Anand misled Plaintiffs Hullinger and de Bont with respect to his intentions and conduct concerning their roles with Agora, and McNiel was also aware that Hullinger and de Bont relied on Anand's representations to their detriment.

    d.  At least as early as February 2013, McNiel was aware that Anand told Hullinger and de Bont that he needed to exit Agora because of his parents' divorce.

    e.  At least as early as February 2013, McNiel was aware that instead of exiting Agora, Anand re-started Agora with Bellanger under a new name (*i.e.*, Prevoty), misappropriated Agora's technology and other assets, diverted funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

    f.  At least as early as February 2013, McNiel was aware that Anand and Bellanger started a new company in the same field as Agora, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont.

    g.  At least as early as February 2013, McNiel was aware that Hullinger and de Bont used Agora's materials and technology for a competing business, without telling Hullinger or de Bont.

    h.  At least as early as February 2013, McNiel was aware that Anand

74

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

and Bellanger owed a duty to disclose these material facts to Plaintiffs Hullinger, de Bont and Agora.

i.  At least as early as February 2013, McNiel was aware that Anand, Bellanger and Prevoty actively concealed these material facts from Plaintiffs Hullinger, de Bont and Agora.

j.  At least as early as February 2013, McNiel was aware that Anand falsely claimed to be the sole owner of Agora, and that Anand and Bellanger claimed to be the sole co-owners of Prevoty, to the exclusion of Hullinger and de Bont.

486.  Stern was aware of the following:

a.  At least as early as January or February 2013, Stern was aware that Plaintiffs Hullinger and de Bont were co-founders and co-owners of Agora.

b.  At least as early as January or February 2013, Stern was aware that Plaintiffs Hullinger and de Bont worked as part of the Agora team in reliance on Anand's representations.

c.  At least as early as January or February 2013, Stern was aware that Anand misled Plaintiffs Hullinger and de Bont with respect to his intentions and conduct concerning their roles with Agora, and Stern was also aware that Hullinger and de Bont relied on Anand's representations to their detriment.

d.  At least as early as February 2013, Stern was aware that Anand told Hullinger and de Bont that he needed to exit Agora because of his parents' divorce.

e.  At least as early as February 2013, Stern was aware that instead of exiting Agora, Anand re-started Agora with Bellanger under a new name (*i.e.*, Prevoty), misappropriated Agora's technology and other assets, diverted funding and customers to Prevoty instead of Agora,

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

and shut out Hullinger and de Bont from the company they co-founded.

f.   At least as early as February 2013, Stern was aware that Anand and Bellanger started a new company in the same field as Agora, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont.

g.   At least as early as February 2013, Stern was aware that Hullinger and de Bont used Agora's materials and technology for a competing business, without telling Hullinger or de Bont.

h.   At least as early as February 2013, Stern was aware that Anand and Bellanger owed a duty to disclose these material facts to Plaintiffs Hullinger, de Bont and Agora.

i.   At least as early as February 2013, Stern was aware that Anand, Bellanger and Prevoty actively concealed these material facts from Plaintiffs Hullinger, de Bont and Agora.

j.   At least as early as February 2013, Stern was aware that Anand falsely claimed to be the sole owner of Agora, and that Anand and Bellanger claimed to be the sole co-owners of Prevoty, to the exclusion of Hullinger and de Bont.

k.   On information and belief, at least as early as October 2014, Stern was aware that Anand fraudulently filed paperwork purporting to cancel Agora's Articles of Organization.

487.  Lilling was aware of the following:

a.   At least as early as January or February 2013, Lilling was aware that Plaintiffs Hullinger and de Bont were co-founders and co-owners of Agora.

b.   At least as early as January or February 2013, Lilling was aware that Plaintiffs Hullinger and de Bont worked as part of the Agora team in

reliance on Anand's representations.

c.  At least as early as January or February 2013, Lilling was aware that Anand misled Plaintiffs Hullinger and de Bont with respect to his intentions and conduct concerning their roles with Agora, and Lilling was also aware that Hullinger and de Bont relied on Anand's representations to their detriment.

d.  At least as early as February 2013, Lilling was aware that Anand told Hullinger and de Bont that he needed to exit Agora because of his parents' divorce.

e.  At least as early as February 2013, Lilling was aware that instead of exiting Agora, Anand re-started Agora with Bellanger under a new name (*i.e.*, Prevoty), misappropriated Agora's technology and other assets, diverted funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

f.  At least as early as February 2013, Lilling was aware that Anand and Bellanger started a new company in the same field as Agora, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont.

g.  At least as early as February 2013, Lilling was aware that Hullinger and de Bont used Agora's materials and technology for a competing business, without telling Hullinger or de Bont.

h.  At least as early as February 2013, Lilling was aware that Anand and Bellanger owed a duty to disclose these material facts to Plaintiffs Hullinger, de Bont and Agora.

i.  At least as early as February 2013, Lilling was aware that Anand, Bellanger and Prevoty actively concealed these material facts from Plaintiffs Hullinger, de Bont and Agora.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

j.  At least as early as February 2013, Lilling was aware that Anand falsely claimed to be the sole owner of Agora, and that Anand and Bellanger claimed to be the sole co-owners of Prevoty, to the exclusion of Hullinger and de Bont.

k.  On information and belief, at least as early as October 2014, Lilling was aware that Anand fraudulently filed paperwork purporting to cancel Agora's Articles of Organization.

488.  Kaminsky was aware of the following:

a.  At least as early as mid-2012, Kaminsky was aware that Plaintiffs Hullinger and de Bont were co-founders and co-owners of Agora.

b.  At least as early as mid-2012, Kaminsky was aware that Plaintiffs Hullinger and de Bont worked as part of the Agora team in reliance on Anand's representations.

c.  At least as early as February or March 2013, Kaminsky was aware that Anand re-started Agora with Bellanger under a new name (*i.e.*, Prevoty), misappropriated Agora's technology and other assets, diverted funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

d.  At least as early as February or March 2013, Kaminsky was aware that Anand and Bellanger started a new company in the same field as Agora, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont.

e.  At least as early as February or March 2013, Kaminsky was aware that Hullinger and de Bont used Agora's materials and technology for a competing business, without telling Hullinger or de Bont.

f.  At least as early as February or March 2013, Kaminsky was aware that Anand and Bellanger owed a duty to disclose these material facts to Plaintiffs Hullinger, de Bont and Agora.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

g.   At least as early as February or March 2013, Kaminsky was aware that Anand, Bellanger and Prevoty actively concealed these material facts from Plaintiffs Hullinger, de Bont and Agora.

h.   At least as early as February or March 2013, Kaminsky was aware that Anand falsely claimed to be the sole owner of Agora, and that Anand and Bellanger claimed to be the sole co-owners of Prevoty, to the exclusion of Hullinger and de Bont.

489.   USVP was aware of the following:

a.   On information and belief, at least as early as fall of 2014, USVP was aware that Plaintiffs Hullinger and de Bont were co-founders and co-owners of Agora.

b.   On information and belief, at least as early as fall of 2014, USVP was aware that Plaintiffs Hullinger and de Bont worked as part of the Agora team in reliance on Anand's representations.

c.   On information and belief, at least as early as fall of 2014, USVP was aware that Anand and Bellanger started a new company in the same field as Agora, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont.

d.   On information and belief, at least as early as fall of 2014, USVP was aware that Hullinger and de Bont used Agora's materials and technology for a competing business, without telling Hullinger or de Bont.

e.   On information and belief, at least as early as fall of 2014, USVP was aware that Anand and Bellanger owed a duty to disclose these material facts to Plaintiffs Hullinger, de Bont and Agora.

f.   On information and belief, at least as early as fall of 2014, USVP was aware that Anand, Bellanger and Prevoty actively concealed these material facts from Plaintiffs Hullinger, de Bont and Agora.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

g.  On information and belief, at least as early as fall of 2014, USVP
was aware that Anand falsely claimed to be the sole owner of Agora,
and that Anand and Bellanger claimed to be the sole co-owners of
Prevoty, to the exclusion of Hullinger and de Bont.

h.  On information and belief, at least as early as fall of 2014, USVP
was aware that Anand fraudulently filed paperwork purporting to
cancel Agora's Articles of Organization.

i.  At least as early as September 2015, USVP was aware that Anand
misled Plaintiffs Hullinger and de Bont concerning documents that
he told them he had filed with the California Secretary of State, and
that Hullinger and de Bont relied on Anand's representations to their
detriment.

j.  At least as early as September 2015, USVP was aware that Anand
told Hullinger and de Bont that he needed to exit Agora because of
his parents' divorce.

k.  At least as early as September 2015, USVP was aware that instead
of exiting Agora, Anand re-started Agora with Bellanger under a
new name (*i.e.*, Prevoty), misappropriated Agora's technology and
other assets, diverted funding and customers to Prevoty instead of
Agora, and shut out Hullinger and de Bont from the company they
co-founded.

490.  Karlin was aware of the following:

a.  On information and belief, at least as early as sometime between
May 2013 and fall of 2014, Karlin became aware that Plaintiffs
Hullinger and de Bont were co-founders and co-owners of Agora.

b.  On information and belief, at least as early as sometime between
May 2013 and fall of 2014, Karlin was aware that Plaintiffs
Hullinger and de Bont worked as part of the Agora team in reliance

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

on Anand's representations.

c.  On information and belief, at least as early as sometime between May 2013 and fall of 2014, Karlin was aware that Anand and Bellanger started a new company in the same field as Agora, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont.

d.  On information and belief, at least as early as sometime between May 2013 and fall of 2014, Karlin became aware that Hullinger and de Bont used Agora's materials and technology for a competing business, without telling Hullinger or de Bont.

e.  On information and belief, at least as early as sometime between May 2013 and fall of 2014, Karlin became aware that Anand and Bellanger owed a duty to disclose these material facts to Plaintiffs Hullinger, de Bont and Agora.

f.  On information and belief, at least as early as sometime between May 2013 and fall of 2014, Karlin became aware that Anand, Bellanger and Prevoty actively concealed these material facts from Plaintiffs Hullinger, de Bont and Agora.

g.  On information and belief, at least as early as sometime between May 2013 and fall of 2014, Karlin became aware that Anand falsely claimed to be the sole owner of Agora, and that Anand and Bellanger claimed to be the sole co-owners of Prevoty, to the exclusion of Hullinger and de Bont.

h.  On information and belief, at least as early as fall of 2014, Karlin became aware that Anand fraudulently filed paperwork purporting to cancel Agora's Articles of Organization.

i.  At least as early as September 2015, Karlin was aware that Anand misled Plaintiffs Hullinger and de Bont concerning documents that

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

he told them he had filed with the California Secretary of State, and that Hullinger and de Bont relied on Anand's representations to their detriment.

    j.  At least as early as September 2015, Karlin was aware that Anand told Hullinger and de Bont that he needed to exit Agora because of his parents' divorce.

    k.  At least as early as September 2015, Karlin was aware that instead of exiting Agora, Anand re-started Agora with Bellanger under a new name (*i.e.*, Prevoty), misappropriated Agora's technology and other assets, diverted funding and customers to Prevoty instead of Agora, and shut out Hullinger and de Bont from the company they co-founded.

491.  On information and belief, Launchpad (including Sam Teller and Adam Lilling) was aware of the following at least as early as sometime between January 2013 and March of 2013:

    a.  Plaintiffs Hullinger and de Bont were co-founders and co-owners of Agora.

    b.  Plaintiffs Hullinger and de Bont worked as part of the Agora team in reliance on Anand's representations.

    c.  Anand and Bellanger started a new company in the same field as Agora, to the exclusion of Hullinger and de Bont, without telling Hullinger or de Bont.

    d.  Hullinger and de Bont used Agora's materials and technology for a competing business, without telling Hullinger or de Bont.

    e.  Anand and Bellanger owed a duty to disclose these material facts to Plaintiffs Hullinger, de Bont and Agora.

    f.  Anand, Bellanger and Prevoty actively concealed these material facts from Plaintiffs Hullinger, de Bont and Agora.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

g. Anand falsely claimed to be the sole owner of Agora, and that Anand and Bellanger claimed to be the sole co-owners of Prevoty, to the exclusion of Hullinger and de Bont.

492. Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) assisted and encouraged Bellanger, Anand and Prevoty in committing and continuing fraud, as set forth herein.

493. Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) substantially assisted and facilitated the fraud by providing substantial and material support in the form of encouragement, assistance, and/or funding, as set forth herein.

494. Among other things, McNiel provided the following support and encouragement, and otherwise supported the fraud:

a. In or around January or February 2013, McNiel actively assisted and/or encouraged Anand and Bellanger to re-start Agora as Prevoty, exclude de Bont and Hullinger and misappropriate the property and technology of Agora.

b. Starting around February 2013 and continuing through today, McNiel has knowingly and intentionally assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.

c. In or around February 2013, McNiel helped Anand and Bellanger start a competing business (Prevoty) to the exclusion of Hullinger and de Bont.

d. Starting in early February 2013 and continuing through today, McNiel personally assisted Anand and Bellanger in converting Agora slide decks to Prevoty slide decks for use by Anand and Bellanger to secure investments and opportunities for Prevoty.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

e. Starting in early January or February 2013, McNiel assisted Anand and Bellanger to conceal these facts from Plaintiffs.

495.  Among other things, Stern provided the following support and encouragement, and otherwise supported the fraud:

a. In or around January or February 2013, Stern personally helped Bellanger and Anand concoct a plan for shutting out Hullinger and de Bont and re-forming Agora as Prevoty.

b. In or around January or February 2013, Stern actively assisted and encouraged Anand and Bellanger to re-start Agora as Prevoty, exclude de Bont and Hullinger and misappropriate the property and technology of Agora.

c. Starting around February 2013 and continuing through today, Stern has knowingly and intentionally assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.

d. In or around February 2013, Stern helped Anand and Bellanger start a competing business (Prevoty) to the exclusion of Hullinger and de Bont.

e. In or around January through March 2013, Stern assisted Anand and Bellanger in converting Agora slide decks to Prevoty slide decks for use by Anand and Bellanger to secure investments and opportunities for Prevoty.

f. Starting in January or February 2013, Stern knowingly provided financial assistance to Anand and Bellanger to re-start Agora as Prevoty, to the exclusion of Hullinger and de Bont, without telling them.

g. Starting in January or February 2013 and continuing through today, Stern has provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to divert

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

investment and revenues from Agora, without telling Hullinger and de Bont.

h. Starting in January or February of 2013, Stern provided advice to Bellanger and Anand on positioning a competing start-up business and reviewed investor pitch decks, in the same space as Agora, without telling Hullinger or de Bont.

i. Starting in January or February of 2013, Stern provided business advice, helping and encouraging Anand and Bellanger to commit the acts of fraud alleged herein.

j. Stern lent his name and reputation to back Prevoty as a re-start of Agora, without telling Hullinger or de Bont.

k. Starting in early January or February 2013, Stern assisted Anand and Bellanger to conceal these facts from Plaintiffs.

496.  Among other things, Lilling provided the following support and encouragement, and otherwise supported the fraud:

a. In or around January or February 2013, Lilling actively assisted and encouraged Anand and Bellanger to re-start Agora as Prevoty, exclude de Bont and Hullinger and misappropriate the property and technology of Agora.

b. Starting around February 2013 and continuing through today, Lilling has knowingly and intentionally assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.

c. In or around February 2013, Lilling helped Anand and Bellanger start a competing business (Prevoty) to the exclusion of Hullinger and de Bont.

d. On information and belief, in or around January through March 2013, Lilling assisted Anand and Bellanger in converting Agora

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

slide decks to Prevoty slide decks for use by Anand and Bellanger to secure investments and opportunities for Prevoty.

e.  Starting in January or February 2013, Lilling knowingly provided financial assistance to Anand and Bellanger to re-start Agora as Prevoty, to the exclusion of Hullinger and de Bont, and without telling them.

f.  Starting in January or February 2013 and continuing through today, Lilling has provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to divert investment and revenues from Agora, without telling Hullinger and de Bont.

g.  Starting in January or February of 2013, Lilling provided advice to Bellanger and Anand on positioning a competing start-up business and reviewed investor pitch decks, in the same space as Agora, without telling Hullinger or de Bont.

h.  Starting in January or February of 2013, Lilling provided business advice, helping and encouraging Anand and Bellanger to commit the acts of fraud alleged herein.

i.  Lilling lent his name and reputation to back Prevoty as a re-start of Agora, without telling Hullinger or de Bont.

j.  Starting in early January or February 2013, Lilling assisted Anand and Bellanger to conceal these facts from Plaintiffs.

497.  Among other things, Kaminsky provided the following support and encouragement, and otherwise supported the fraud:

a.  Starting around February or March 2013 and continuing through today, Kaminsky has assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.

b.  Starting in January or February 2013 and continuing through today, Kaminsky has provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to divert investment and revenues from Agora, without telling Hullinger and de Bont.

c.  Starting in January or February of 2013, Kaminsky provided advice to Bellanger and Anand on positioning a competing start-up business, in the same space as Agora, without telling Hullinger or de Bont.

d.  Starting in January or February of 2013, Kaminsky provided business and technical advice, helping and encouraging Anand and Bellanger to commit the acts of fraud alleged herein.

e.  Kaminsky lent his name and reputation to back Prevoty as a re-start of Agora, without telling Hullinger or de Bont.

f.  Starting in early January or February 2013, Kaminsky assisted Anand and Bellanger to conceal these facts from Plaintiffs.

498.  Among other things, USVP provided the following support and encouragement, and otherwise supported the fraud:

a.  Starting around fall of 2014 and continuing through today, USVP has assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.

b.  Starting around fall of 2014 and continuing through today, USVP has provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to divert investment and revenues from Agora, without telling Hullinger and de Bont.

c.  Starting around fall of 2014, USVP provided advice to Bellanger and Anand on positioning a competing start-up business, in the same space as Agora, without telling Hullinger or de Bont.

87

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

d.  Starting at least as early as fall of 2014, USVP encouraged other investors to provide further funding, thereby helping to divert investment from Agora and exacerbating the fraud against Plaintiffs.

e.  Starting around fall of 2014, USVP provided business advice, helping and encouraging Anand and Bellanger to commit the acts of fraud alleged herein.

f.  Starting around fall of 2014, USVP lent its name and reputation to back Prevoty with other potential investors and customers, without telling Hullinger or de Bont.

g.  Starting around fall of 2014, USVP assisted Anand and Bellanger to conceal these facts from Plaintiffs.

h.  In approximately March of 2015, USVP provided much-needed financial assistance to Anand, Bellanger and Prevoty to help them in their continuing fraud as alleged herein. Without such financial assistance, Anand, Bellanger and Prevoty could not have continued to engage in that fraudulent scheme.

i.  On information and belief, in the fall of 2014, USVP encouraged Anand and Bellanger to submit materials purporting to dissolve Agora and cancel its Articles of Organization.  USVP did so knowing Anand and Bellanger would not inform Hullinger and de Bont of the cancellation.

j.  USVP continued providing Anand, Bellanger and Prevoty with support and encouragement even after Plaintiffs provided USVP with details and evidence pointing to Anand's, Bellanger's and Prevoty's on-going fraud.

k.  As late as March 2016, USVP supported, aided and abetted Defendants Prevoty, Anand and Bellanger by promoting them as part of the "USVP CEO Conference Israel 2016."

88

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

499.  Among other things, Karlin provided the following support and encouragement, and otherwise supported the fraud:

     a.  Starting around May 2013 and continuing through today, Karlin assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.

     b.  Starting around May 2013 and continuing through today, Karlin has provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to divert investment and revenues from Agora, without telling Hullinger and de Bont.

     c.  Starting around May 2013, Karlin provided advice to Bellanger and Anand on positioning a competing start-up business, in the same space as Agora, without telling Hullinger or de Bont.

     d.  Starting at least as early as May 2013, Karlin encouraged other investors to provide further funding, thereby helping to divert investment from Agora and exacerbating the fraud against Plaintiffs.

     e.  Starting around May 2013, Karlin provided business advice, helping and encouraging Anand and Bellanger to commit the acts of fraud alleged herein.

     f.  Starting around mid-2013, Karlin lent its name and reputation to back Prevoty with other potential investors and customers, without telling Hullinger or de Bont.

     g.  Starting around May 2013, Karlin assisted Anand and Bellanger to conceal these facts from Plaintiffs.

     h.  In approximately August 2013, Karlin promised financial assistance to Anand, Bellanger and Prevoty to help them in their continuing fraud as alleged herein.  Karlin also provided actual cash investments in or around December 2013, and again in or around March of 2015.  Without such financial assistance, Anand, Bellanger

89

and Prevoty could not have continued to engage in that fraudulent scheme.

i. On information and belief, in the fall of 2014, Karlin encouraged Anand and Bellanger to submit materials purporting to dissolve Agora and cancel its Articles of Organization.  Karlin did so knowing Anand and Bellanger would not inform Hullinger and de Bont of the cancellation.

j. Karlin continued providing Anand, Bellanger and Prevoty with support and encouragement even after Plaintiffs provided Karlin with details and evidence pointing to Anand's, Bellanger's and Prevoty's on-going fraud.

k. For example, in or around November 2015, Karlin invited Defendants Prevoty, Anand and Bellanger to participate in the "LA First Look Retreat" sponsored by Karlin.  In doing so, Karlin further encouraged, facilitated, aided and abetted the on-going wrongful conduct alleged herein.

l. As recently as January 2016, Karlin representative Zhuo has continued to support and encourage the wrongful conduct alleged herein.  On or about January 14, 2016, Zhuo published an article characterizing Defendant Prevoty as one of three "thriving startups which I believe will form the pillars of cyber security in the future." Zhuo further supported Prevoty by adding the following: "Take Prevoty for example, organizations these days run multiple applications and the number will continue to grow.  Instead of having a one size fits all security solution, organizations now need tailored security platform for each of their applications.  Guiding the CSO to understand the problem, its magnitude and how your platform will fix that is what Prevoty does well."

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

500.   Among other things, Launchpad (including Sam Teller and Adam Lilling) provided the following support and encouragement, and otherwise supported the fraud:

a.   Starting around March 2013 and continuing through today, Launchpad (led by Teller) provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to divert investment and revenues from Agora, without telling Hullinger and de Bont.  As discussed above, Launchpad LA co-founder Adam Lilling started doing so even earlier.

b.   Starting around March 2013, Launchpad (led by Teller) provided advice to Bellanger and Anand on positioning a competing start-up business, in the same space as Agora, without telling Hullinger or de Bont.  As discussed above, Launchpad LA co-founder Adam Lilling started doing so even earlier.

c.   Starting at least as early as March 2013, Launchpad (led by Teller) encouraged other investors to provide further funding for Prevoty, thereby helping to divert investment from Agora and exacerbating the fraud against Plaintiffs.  As discussed above, Launchpad LA co-founder Adam Lilling started doing so even earlier.

d.   Starting around March 2013, Launchpad (including Teller) provided business advice, helping and encouraging Anand and Bellanger to commit the acts of fraud alleged herein.  As discussed above, Launchpad LA co-founder Adam Lilling started doing so even earlier.

e.   Starting around March 2013, Launchpad (led by Teller) lent its name and reputation to back Prevoty with other potential investors and customers, without telling Hullinger or de Bont.

f.   Starting around February or March 2013, Launchpad assisted Anand and Bellanger to conceal these facts from Plaintiffs.

g.   Starting around approximately February or March 2013, Launchpad (led by Teller) promised financial assistance to Anand, Bellanger and Prevoty to help them in their continuing fraud as alleged herein. Without such financial assistance, Anand, Bellanger and Prevoty could not have continued to engage in that fraudulent scheme. As discussed above, Launchpad LA co-founder Adam Lilling started doing so even earlier.

h.   Starting around February or March 2013, Launchpad (led by Teller) promised to provide office space and other office resources to Anand, Bellanger and Prevoty to help them in their continuing fraud as alleged herein. Launchpad actually provided such services, including offices space, from approximately March 2013 through approximately October 2, 2013.

501.  The assistance provided by each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) was a substantial factor in accomplishing the fraud and furthering the fraud alleged herein and was a substantial factor in causing Plaintiffs' damages.

502.  Each of Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) was aware of the fraud and intended that such fraud should occur.

503.  Each of Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) acted with the intent to participate in the ongoing fraud by Anand, Bellanger and Prevoty for the purpose of assisting them in performing the acts constituting fraud.

504.  Plaintiffs seek damages in an amount to be proven at trial.

505.  Each of Defendants Stern, Lilling, McNiel, Kaminsky, USVP, Karlin

and Launchpad (including Teller) has also acted with fraud, oppression and/or malice.  Accordingly, Plaintiffs also seek an award of punitive and special damages.

## TWELFTH CAUSE OF ACTION

### (Constructive Fraud, Against Defendants Anand and Bellanger)

506.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

507.  Each of Defendants Anand and Bellanger had a confidential and fiduciary relationship with each of Plaintiffs Hullinger, de Bont and Agora.

508.  On May 1, 2012, Anand sent Hullinger and de Bont an email representing that the "LLC has been amended" to include both of them as co-founders, and that a "revised Statement of Information document has been sent to the State of California."  To the extent Anand—and later Bellanger—believed there were reasons to doubt Hullinger's and/or de Bont's status as members of Agora, Anand and Bellanger had a duty to inform Hullinger and de Bont of any facts and circumstances giving rise to such arguments.

509.  Anand and Bellanger failed to disclose this material information to Hullinger and de Bont.

510.  On or about February 18, 2013, Anand told Hullinger and de Bont that he needed to exit Agora (including shutting down its email and network) because of his parents' divorce.  Anand represented that he could not focus on the company because he needed to focus on his family.  Anand's purported reasoning for shutting out Hullinger and de Bont was false, and Anand did not actually stop working for the company.  Instead, he simply changed the corporate name and structure, re-starting the same company as a Delaware corporation, to the exclusion of Hullinger and de Bont.

511.  On information and belief, Bellanger was aware of the false statements made by Anand to Hullinger and de Bont concerning his rationale for excluding Hullinger and de Bont.  Bellanger was also aware that he and Anand were re-starting

the same company under a different corporate name, to the exclusion of Hullinger and de Bont.  Bellanger had a duty to inform Hullinger, de Bont and Agora of these facts, but Bellanger failed to do so.

512.  Anand and Bellanger had a duty to inform Hullinger, de Bont and Agora that Anand and Bellanger were starting a new company in the same field as Agora, but they failed to do so.

513.  Anand and Bellanger had a duty to inform Hullinger, de Bont and Agora that they, along with Prevoty, were using and intending to use Agora's materials and technology for a competing business, but they failed to do so.

514.  These material omissions and misrepresentations affected Anand's and Bellanger's motives, as well as Hullinger's, de Bont's and Agora's decisions.

515.  For example, Hullinger and de Bont would not have contributed their efforts and operated their co-owned business as Agora had they known there were questions regarding their ownership interest.  Indeed, Hullinger and de Bont would have taken concrete steps to remove any doubts concerning their equal ownership of the company, had they known there was any reason to question it.

516.  As another example, Hullinger, de Bont and Agora would not have permitted Bellanger and/or Anand to access Agora's technology and other confidential information, and would not have involved them in client pitches, investor pitches, and solicitation of legal counsel, among other things, had they known of these misrepresentations and omissions.

517.  These omissions and misrepresentations also affected Anand's and Bellanger's motivations.  For example, Anand and Bellanger took advantage of these omissions and representations to re-form Agora under a different corporate name, shut out Hullinger and Anand from the company, and to later purport to dissolve and cancel Agora.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

## **THIRTEENTH CAUSE OF ACTION**

### **(Aiding and Abetting a Constructive Fraud, Against Defendants McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad)**

518.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

519.  McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) assisted and encouraged Bellanger and Anand in committing constructive fraud.

520.  Each of Defendants McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) had actual knowledge of the constructive fraud and continuing constructive  fraud perpetuated by Defendants Bellanger, Anand and Prevoty.

521.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) was aware of Bellanger and Anand's confidential and fiduciary relationship with each of the Plaintiffs.

522.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) was aware that Anand and Bellanger had a duty to inform Hullinger, de Bont and Agora that Anand and Bellanger were starting a new company in the same field as Agora, and that they failed to do so.

523.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) was aware that Anand and Bellanger had a duty to inform Hullinger, de Bont and Agora that they were using Agora's materials and technology for a competing business, and that they failed to do so.

524.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) agreed to further Anand, Bellanger, and Prevoty's constructive fraud.

525.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) substantially assisted and facilitated the constructive fraud by providing material support in the form of encouragement, assistance, and/or

funding.

526.   Stern provided substantial assistance and encouragement to Anand and Bellanger.  Stern actively assisted and encouraged Anand and Bellanger to re-start Agora as Prevoty, exclude de Bont and Hullinger and misappropriate the property and technology of Agora.  Stern helped to create a plan to re-start Agora as Prevoty without Hullinger and de Bont.  On information and belief, Stern also agreed to actively conceal these material facts from Plaintiffs Hullinger, de Bont and Agora.  Stern further provided financial assistance to Anand and Bellanger to perpetuate their constructive fraud.  Stern also knowingly and intentionally assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.  Stern provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to divert investment and revenues from Agora.  Stern provided advice to Bellanger and Anand on positioning a competing start-up business and reviewed investor pitch decks for Prevoty.  Stern also lent his name and reputation to back Prevoty, including on pitch decks for Prevoty.

527.   Lilling provided substantial assistance and encouragement to Anand and Bellanger.  Lilling actively assisted and encouraged Anand and Bellanger to re-start Agora as Prevoty, exclude de Bont and Hullinger and misappropriate the property and technology of Agora.  On information and belief, Lilling also agreed to actively conceal these material facts from Plaintiffs Hullinger, de Bont and Agora.  Lilling further provided financial assistance to Anand and Bellanger to perpetuate their constructive fraud.  Lilling also knowingly and intentionally assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.  Lilling provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to divert investment and revenues from Agora.  Lilling provided advice to Bellanger and Anand on positioning a competing start-up business and reviewed investor pitch decks for Prevoty.  Lilling also lent his name and reputation to back Prevoty, including on pitch decks for Prevoty.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

528.  McNiel provided substantial assistance and encouragement to Anand and Bellanger.  McNiel actively assisted Anand and Bellanger in re-starting Agora as Prevoty, excluding de Bont and Hullinger and misappropriating the property and technology of Agora.  On information and belief, McNiel also agreed to actively conceal these material facts from Plaintiffs Hullinger, de Bont and Agora.  McNiel also knowingly and intentionally assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.  McNiel personally assisted Anand and Bellanger in converting Agora slide decks into Prevoty slide decks for diverting potential investments and opportunities.

529.  Kaminsky provided substantial assistance and encouragement to Anand and Bellanger.  Kaminsky also knowingly and intentionally assisted Anand and Bellanger in diverting investment and customers from Agora to Prevoty.  Kaminsky helped Anand and Bellanger start a competing business (Prevoty) to the exclusion of Hullinger and de Bont.  On information and belief, Kaminsky also agreed to actively conceal these material facts from Plaintiffs Hullinger, de Bont and Agora. Kaminsky further provided Anand and Bellanger with introductions to additional investors and customers, thereby helping to divert investment and revenues from Agora.  Kaminsky also provided advice to Bellanger and Anand on positioning a competing start-up business and reviewed investor pitch decks for Prevoty. Kaminsky provided business and/or technical advice, helping and encouraging Anand and Bellanger to commit acts amounting to constructive fraud against Plaintiffs.  Kaminsky lent his name and reputation to back Prevoty, including on pitch decks for Prevoty.

530.  Each of USVP, Karlin and Launchpad (including Teller) provided substantial assistance and encouragement to Anand and Bellanger.  Each provided much-needed financial assistance to Anand and Bellanger to help them in their continuing constructive fraud.  Each provided Anand and Bellanger with introductions to additional investors and encouraged those other investors to provide

further funding, thereby helping to divert investment from Agora and exacerbating the constructive fraud against Plaintiffs.  Each also provided business advice and encouragement to Anand and Bellanger to commit acts amounting to constructive fraud.

531.  On information and belief, each of USVP and Karlin encouraged Anand and Bellanger to submit materials purporting to dissolve Agora and cancel its Articles of Organization.

532.  Each of Karlin and USVP continued to provide Anand and Bellanger with support and encouragement even after Plaintiffs provided extensive information and a draft Complaint detailing Anand and Bellanger's breaches.  On information and belief, even after receiving detailed information, Karlin and USVP failed to conduct any meaningful investigation or take remedial action but, instead, simply forwarded the allegations to the primary wrongdoers (Anand and Bellanger).

533.  As a result of Defendants McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad's aiding and abetting of the constructive fraud against Plaintiffs, Plaintiffs have suffered and continue to suffer significant damage in an amount to be proven at trial.

534.  Launchpad (led by Teller) also provided office space and other office resources to Anand, Bellanger and Prevoty to help them in their continuing constructive fraud as alleged herein.

535.  The assistance provided by each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) was a substantial factor in facilitating the constructive fraud alleged herein and a substantial factor in causing Plaintiffs' damages.

536.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) was aware of Defendants' constructive fraud and intended that it should occur.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

537.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) acted with the intent to participate in the ongoing constructive fraud by Anand, Bellanger and Prevoty for the purpose of assisting them in performing the acts constituting the constructive fraud.

538.  Each of Defendants McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) has also acted with fraud, oppression and/or malice.  Accordingly, Plaintiffs also seek an award of punitive and special damages.

## FOURTEENTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets, Against Defendants Anand, Bellanger, Prevoty, McNiel, Lilling, Kaminsky and Stern)

539.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

540.  Plaintiffs' confidential information relating to Agora's unique underlying software technology, including the Agora Blue Source Code, derives independent economic value from not being widely known to the public, and Plaintiffs used reasonable means to maintain its secrecy.

541.  Each of Anand, Bellanger, Prevoty, McNiel, Lilling, Kaminsky and Stern knew and had reason to know that Agora's proprietary information, including the Agora Blue Source Code and other technology, was protected as a trade secret.

542.  For example, as early as March 2012, McNiel was aware that Agora had proprietary source code, he knew that Anand, Hullinger and de Bont were working together on that source code, and he knew that the source code was being maintained as a trade secret.

543.  Similarly, in 2012 and 2013, McNiel was aware that Agora Blue was engineered by Anand, Hullinger and de Bont through proprietary algorithms.

544.  Anand and Bellanger, as fiduciaries to Agora, were under a duty to maintain the secrecy of Agora's trade secrets and confidential information.

545.  On information and belief, Defendants improperly appropriated Plaintiffs' confidential and proprietary information and trade secrets, through

misrepresentations and other improper means, and used such information without Plaintiffs' express or implied consent, despite having knowledge or reason to know that said acquisition and use was in breach of Anand's and Bellanger's duty to maintain the information's secrecy and value.

546. Defendants' misappropriation of Agora's trade secrets violates § 3426.1 of the California Civil Code, *i.e.* the Uniform Trade Secrets Act (UTSA).

547. As a result of Defendants' unlawful misappropriation and use of Agora's confidential and proprietary information and trade secrets, Plaintiffs have suffered significant harm, entitling them to an injunction under § 3426.2(a) of the UTSA to prevent Defendants' use of such information and materials, damages and attorneys fees under §§ 3426.3(a) and 3426.4 of the UTSA, and exemplary damages under § 3426.3(c), for Defendants' willful and malicious misappropriation of Plaintiffs' trade secrets.

548. Defendants Anand, Bellanger, Prevoty, McNiel, Lilling, Kaminsky and Stern also conspired to commit the misappropriation described herein.

549. Anand, Bellanger, McNiel, Lilling, Kaminsky and Stern mutually and surreptitiously agreed and planned—either orally, in writing and/or implicitly through their actions—to undertake the wrongful misappropriation described above against Plaintiffs.

550. In doing so, Anand and Bellanger acted both in their personal capacity and in their respective roles with and on behalf of Prevoty.

551. Anand and Bellanger were each aware of the other's wrongful conduct in furtherance of their plans to commit the misappropriation, and intended that such misappropriation should occur.

552. McNiel, Lilling, Kaminsky and Stern acted for their own financial gain.

553. McNiel, Lilling, Kaminsky and Stern each knew Agora used proprietary software/source code to operate its business and that such source code was misappropriated by Anand, Bellanger and Prevoty.

554.  Each of McNiel, Lilling, Kaminsky and Stern took actions in furtherance of the common design to misappropriate Plaintiffs' trade secrets.

555.  Among other things, on or about February 10, 2013, Bellanger, Anand, Stern and McNiel worked together to change all "Agora" references in the pitch deck to "Prevoty."  The title changed from "AGORA: Trust the Web" to "PREVOTY: Trust the Web."   In the revised slides decks, they imputed ownership of Agora's source code, proprietary alogithms and other trade secrets, to Prevoty.

556.  McNiel, Lilling, Kaminsky and Stern were each aware of Anand and Bellanger's wrongful conduct in furtherance of their plans to commit the misappropriation, and intended that such misappropriation should occur.

557.  Accordingly, Anand, Bellanger, Prevoty, McNiel, Lilling, Kaminsky and Stern are responsible and liable for any harm caused by the other co-conspirator.

558.  Plaintiffs have suffered significant damages as a result of Anand's, Bellanger's, Prevoty's, Lilling's, Kaminsky's, McNiel's and Stern's wrongful conduct.

559.  Each of Defendants Anand, Bellanger, Prevoty, McNiel, Lilling, Kaminsky and Stern has also acted with fraud, oppression and/or malice. Accordingly, Plaintiffs also seek an award of punitive and special damages.

## FIFTEENTH CAUSE OF ACTION

**(Aiding and Abetting Misappropriation of Trade Secrets, Against Defendants McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad)**

560.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

561.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) had actual knowledge of the misappropriation and continuing misappropriation of trade secrets perpetrated by Defendants Bellanger, Anand and Prevoty.

562.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) knew and had reason to know that Agora's proprietary information, including the Agora Blue Source Code and other proprietary materials and technology, was protected as a trade secret.

563.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) also knew that Anand, Bellanger and Prevoty were improperly using the Agora Blue Source Code and other proprietary materials and technology belonging to Plaintiffs.Prevoty's source code has been unchanged between 2013 and April 2016.

564.  At least as early as 2013 and continuing through today, each of McNiel, Stern, Lilling and Kaminsky has been aware that Defendants Bellanger, Anand and Prevoty improperly appropriated Plaintiffs' trade secrets, including the Agora Blue Source Code.

565.  On information and belief, at least since the fall of 2014, USVP has been aware that Defendants Bellanger, Anand and Prevoty improperly appropriated Plaintiffs' trade secrets, including the Agora Blue Source Code.

566.  On information and belief, at least since sometime between May 2013 and fall of 2014, Karlin has been aware that Defendants Bellanger, Anand and Prevoty improperly appropriated Plaintiffs' trade secrets, including the Agora Blue Source Code.

567.  On information and belief, at least since sometime between February and March 2013, Launchpad (including Teller) has been aware that Defendants Bellanger, Anand and Prevoty improperly appropriated Plaintiffs' trade secrets, including the Agora Blue Source Code, and continue to do so.

568.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) substantially assisted and encouraged Bellanger, Anand and Prevoty in committing and continuing the misappropriation of trade secrets, as set forth herein.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

569.  McNiel provided substantial support and encouragement, and otherwise supported the misappropriation of Agora's trade secrets comprising source code, technology and customer and investors decks, among other things.  McNiel actively assisted and/or encouraged Anand and Bellanger to re-start Agora as Prevoty, exclude de Bont and Hullinger and misappropriate Agora's trade secrets.  McNiel also knowingly and intentionally assisted Anand and Bellanger in acquiring customers for use of Agora's trade secrets and investors who would facilitate further misappropriation of Agora's trade secrets.

570.  Stern provided substantial support and encouragement, and otherwise supported the misappropriation of Agora's trade secrets comprising source code, technology and customer and investors decks, among other things.  Stern personally helped Bellanger and Anand concoct a plan for re-starting Agora as Prevoty, shutting out Hullinger and de Bont, and misappropriating Agora's trade secrets.  Stern knowingly provided financial assistance to Anand and Bellanger to re-start Agora as Prevoty, using Agora's trade secrets, including the Agora Blue Source Code and confidential technology now described in the '722 and '223 Patents.  Stern knowingly and intentionally assisted Anand and Bellanger in acquiring customers for use of Agora's trade secrets and investors who would facilitate further misappropriation of Agora's trade secrets.  Stern lent his name and reputation to back Anand, Bellanger and Prevoty's trade secret misappropriation.

571.  Lilling provided substantial support and encouragement, and otherwise supported the misappropriation of Agora's trade secrets comprising source code, technology and customer and investors decks, among other things.  Lilling knowingly provided financial assistance to Anand and Bellanger to re-start Agora as Prevoty, using Agora's trade secrets, including the Agora Blue Source Code and confidential technology now described in the '722 and '223 Patents.  Lilling knowingly and intentionally assisted Anand and Bellanger in acquiring customers for use of Agora's trade secrets and investors who would facilitate further

misappropriation of Agora's trade secrets.  Lilling lent his name and reputation to back Anand, Bellanger and Prevoty's trade secret misappropriation.

572.  Kaminsky provided substantial support and encouragement, and otherwise supported the misappropriation of Agora's trade secrets comprising source code, technology and customer and investors decks, among other things.  Kaminsky knowingly provided financial and technical assistance to Anand and Bellanger to re-start Agora as Prevoty, using Agora's trade secrets.  Kaminsky knowingly and intentionally assisted Anand and Bellanger in acquiring customers for use of Agora's trade secrets and investors who would facilitate further misappropriation of Agora's trade secrets.  Kaminsky lent his name and reputation to back Anand, Bellanger and Prevoty's trade secret misappropriation.

573.  USVP provided substantial support and encouragement, and otherwise supported the misappropriation of Agora's trade secrets comprising source code, technology and customer and investors decks, among other things.  USVP knowingly provided financial assistance to Anand and Bellanger to continue using Agora's trade secrets, including the Agora Blue Source Code and confidential technology now described in the '722 and '223 Patents.  USVP knowingly and intentionally assisted Anand and Bellanger in acquiring customers for use of Agora's trade secrets and investors who would facilitate further misappropriation of Agora's trade secrets.  USVP continued providing Anand, Bellanger and Prevoty with support and encouragement to continue the trade secret misappropriation even after Plaintiffs provided USVP with evidence detailing Anand's, Bellanger's and Prevoty's on-going misappropriation.  USVP intended for Anand, Bellanger and Prevoty to continue to misappropriate Agora's trade secrets.

574.  Karlin provided substantial support and encouragement, and otherwise supported the misappropriation of Agora's trade secrets comprising source code, technology and customer and investors decks, among other things.  Karlin knowingly provided financial assistance to Anand and Bellanger to continue using

Agora's trade secrets, including the Agora Blue Source Code and confidential technology now described in the '722 and '223 Patents. Karlin knowingly and intentionally assisted Anand and Bellanger in acquiring customers for use of Agora's trade secrets and investors who would facilitate further misappropriation of Agora's trade secrets. Karlin continued providing Anand, Bellanger and Prevoty with support and encouragement to continue the trade secret misappropriation even after Plaintiffs provided Karlin with evidence detailing Anand's, Bellanger's and Prevoty's on-going misappropriation. Karlin intended for Anand, Bellanger and Prevoty to continue to misappropriate Agora's trade secrets.

575. Launchpad (including Teller) provided substantial support and encouragement, and otherwise supported the misappropriation of Agora's trade secrets comprising source code and technology, among other things. Launchpad incubated Anand, Bellanger and Prevoty, providing office space and other office services, to enable the continued misappropriation of Agora's trade secrets. Launchpad knowingly provided financial assistance to Anand and Bellanger to continue using Agora's trade secrets, including the Agora Blue Source Code and confidential technology now described in the '722 and '223 Patents. Launchpad knowingly and intentionally assisted Anand and Bellanger in acquiring customers for use of Agora's trade secrets and investors who would facilitate further misappropriation of Agora's trade secrets. Launchpad also lent its name and reputation to back Anand, Bellanger and Prevoty's trade secret misappropriation.

576. The assistance provided by each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) was a substantial factor in enabling and continuing the trade secret misappropriation alleged herein and a substantial factor in causing Plaintiffs' damages.

577. Each of Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) was aware of the trade secret misappropriation and intended that it should occur.

578.  Each of Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) acted with the intent to participate in the ongoing misappropriation of Plaintiffs trade secrets by Anand, Bellanger and Prevoty for the purpose of assisting them in performing the acts constituting the misappropriation.

579.  Further, USVP and Karlin helped identify potential new users, including partners and customers, for the misappropriated source code and other technology.

580.  Plaintiffs seek damages in an amount to be proven at trial.

581.  Each of Defendants Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) has also acted with fraud, oppression and/or malice.  Accordingly, Plaintiffs also seek an award of punitive and special damages.

### SIXTEENTH CAUSE OF ACTION

**(Conversion, Against Defendants Anand, Bellanger, Prevoty, McNiel, Stern, Kaminsky and Lilling)**

582.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

583.  Plaintiffs owned, possessed and/or were entitled to immediate possession of personal property and other proprietary assets, which were converted by Defendants.  The converted property includes, among other things, cash held in various bank accounts, email accounts, emails, programming, software, documents, other papers, patents, and other proprietary assets.

584.  These properties and assets further include a 33.33% ownership interest in Agora for each of individual Plaintiffs Hullinger and de Bont, which was wrongfully converted by Defendants.

585.  Defendants Anand, Bellanger, Prevoty, McNiel, Stern, Kaminsky and Lilling substantially interfered with Plaintiffs' possession and control of their property, and continue to do so until today.

586.  Among other things, Defendants substantially interfered with Plaintiffs' possession and control of their property by taking and using Agora's property and other papers when developing and promoting Prevoty's business and technology.

587.  Moreover, the methods, source code, programming and software pertaining to Agora's technology all constitute intellectual and physical property created for and rightfully belonging to Plaintiffs.  As such, Plaintiffs are entitled to exercise control and ownership over such property.

588.  Defendants not only substantially interfered with Agora's confidential information, but also interfered with Plaintiffs' access to their own documents and information.  Defendants physically and abruptly cut off Hullinger and de Bont from their email accounts, as well as other documents housed on the agorasec.com network and other shared drives, including source code documents.  These documents have independent value, as the physical or electronic copies were required for operating Plaintiffs' business.

589.  Defendants also substantially interfered with Hullinger, de Bont and Agora's agorasec.com email accounts.  The email accounts have independent value because they were used for contacting prospective customers, prospective investors, advisors and other important resources.  Defendants prevented Plaintiffs from accessing these accounts.

590.  Further, as alleged above, Anand filed with the PTO two patent applications in his own name – the '622 and '807 Applications – describing methods to secure user-generated content through tokenization and parsing.  He subsequently assigned these patent applications to Prevoty on December 16, 2014—assignments that Prevoty accepted.  The technology in Anand's patent applications constituted the same underlying technology offered by Agora in the Agora Blue product, and is rightfully owned by Agora.

591.  Defendants Anand, Bellanger and Prevoty have intentionally and substantially interfered with Agora's property rights by patenting, taking possession of and transferring such intellectual property to Prevoty without Plaintiffs' consent.

592.  Defendants Anand, Bellanger, Prevoty, McNiel, Stern, Kaminsky and Lilling also conspired to commit the conversion described herein.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

593.  Anand, Bellanger, McNiel, Stern, Kaminsky and Lilling mutually and surreptitiously agreed and planned—either orally, in writing and/or implicitly through their actions—to undertake the wrongful conversion of Plaintiffs' properties and assets described above.

594.  In doing so, Anand and Bellanger acted both in their personal capacity and in their respective roles with and on behalf of Prevoty.

595.  Anand and Bellanger were each aware of the other's wrongful conduct in furtherance of their plans to commit conversion, and intended that such conversion should occur.

596.  McNiel, Stern, Kaminsky and Lilling acted for their own financial gain.

597.  McNiel, Stern, Kaminsky and Lilling were each aware of Anand and Bellanger's wrongful conduct in furtherance of their plans to commit conversion, and intended that such conversion should occur.

598.  Accordingly, Anand, Bellanger, Prevoty, McNiel, Stern, Kaminsky and Lilling are responsible and liable for any harm caused by the other co-conspirator.

599.  As a result of Defendants' unlawful conversion, Plaintiffs have suffered significant damages in an amount to be proven at trial.

600.  Plaintiffs are also entitled to preliminary and permanent injunctive relief ordering the return of their property.

601.  Defendants have also acted with fraud, oppression and/or malice. Accordingly, Plaintiffs also seek an award of punitive and special damages.

## SEVENTEENTH CAUSE OF ACTION

### (Aiding and Abetting Conversion Against Defendants Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad)

602.   Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

603.  Each of Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) was aware of the on-going conversion of Plaintiffs' properties and assets perpetrated by Defendants Bellanger, Anand and Prevoty.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

604.  At least as early as early 2013 and through today, each of Stern, Lilling and McNiel has been aware that Defendants Bellanger, Anand and Prevoty converted Plaintiffs' properties and assets, including among other things, software, documents, intellectual property, and other Agora proprietary assets.

605.  These properties and assets include the methods, source code, programming and software pertaining to Agora's technology, as well as patent applications filed by Prevoty based on Agora's technology.

606.  These properties and assets further include a 33.33% ownership interest in Agora for each of individual Plaintiffs Hullinger and de Bont, which was wrongfully converted by Defendants.

607.  On information and belief, at least as early as fall of 2014, USVP has been aware that Defendants Bellanger, Anand and Prevoty improperly converted Plaintiffs' properties and assets described above, including software, documents, intellectual property, and other Agora proprietary assets.  USVP also learned the conversion was and continues to be on-going, as the converted property has never been returned to Plaintiffs.

608.  On information and belief, at least since sometime between May 2013 and fall of 2014, Karlin has been aware that Defendants Bellanger, Anand and Prevoty improperly converted Plaintiffs' properties and assets described above, including software, documents, intellectual property, and other Agora proprietary assets referenced herein.  Karlin also learned the conversion was and continues to be on-going, as the converted property has never been returned to Plaintiffs.

609.  On information and belief, at least since sometime between January and March 2013, Launchpad (including Teller) has been aware that Defendants Bellanger, Anand and Prevoty improperly converted Plaintiffs' properties and assets described above, including software, documents, intellectual property, and other Agora proprietary assets.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

610.  Each of McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) substantially assisted and encouraged Bellanger, Anand and Prevoty in committing and continuing the conversion of Plaintiffs' properties and assets, as set forth herein.  Each intended that such conversion continue.

611.  McNiel provided support and encouragement, and otherwise supported the conversion of Plaintiffs' properties and assets comprising source code, technology and customer and investors decks, among other things.  McNiel actively assisted and encouraged Anand and Bellanger to re-start Agora as Prevoty, exclude de Bont and Hullinger and convert Plaintiffs' properties and assets.  McNiel personally assisted Anand and Bellanger in converting Plaintiffs' properties and assets, including slide decks, for use by Prevoty.

612.  Stern provided support and encouragement, and otherwise supported the conversion of Plaintiffs' properties and assets comprising source code, technology and customer and investors decks, among other things.  Stern personally helped Bellanger and Anand concoct a plan for re-starting Agora as Prevoty, shutting out Hullinger and de Bont, and converting Plaintiffs' properties and assets.  Stern knowingly provided financial assistance to Anand and Bellanger to re-start Agora as Prevoty, using Agora's properties and assets, including the Agora Blue Source Code and confidential technology now described in the '722 and '223 Patents.  Stern assisted Anand and Bellanger in converting Agora slide decks to Prevoty slide decks for use by Prevoty.  Stern lent his name and reputation to back conversion of Plaintiffs' properties and assets, including on Prevoty pitch decks.

613.  Lilling provided support and encouragement, and otherwise supported the conversion of Plaintiffs' properties and assets comprising source code, technology and customer and investors decks, among other things.  Lilling knowingly provided financial assistance to Anand and Bellanger to re-start Agora as Prevoty, using Plaintiffs' properties and assets, including the Agora Blue Source

Code and confidential technology now described in the '722 and '223 Patents. Lilling assisted Anand and Bellanger in converting Agora slide decks to Prevoty slide decks for use by Prevoty. Lilling lent his name and reputation to back conversion of Plaintiffs' properties and assets, including on Prevoty pitch decks.

614.  Kaminsky provided support and encouragement, and otherwise supported the conversion of Plaintiffs' properties and assets comprising source code, technology and customer and investors decks, among other things. Kaminsky knowingly provided advisory and technical assistance to Anand and Bellanger to re-start Agora as Prevoty, using Plaintiffs' properties and assets, including the Agora Blue Source Code and confidential technology now described in the '722 and '223 Patents. Kaminsky lent his name and reputation to back conversion of Plaintiffs' properties and assets, including on Prevoty pitch decks.

615.  USVP provided support and encouragement, and otherwise supported the conversion of Plaintiffs' properties and assets comprising source code, technology and customer and investors decks, among other things. USVP knowingly provided financial assistance to Anand and Bellanger to continue using Plaintiffs' properties and assets, including the Agora Blue Source Code and confidential technology now described in the '722 and '223 Patents. USVP continued providing Anand, Bellanger and Prevoty with support and encouragement to maintain the conversion of Plaintiffs' properties and assets even after Plaintiffs provided USVP with evidence detailing Anand, Bellanger and Prevoty's on-going conversion. USVP intended for the conversion of the items mentioned herein to continue.

616.  Karlin provided support and encouragement, and otherwise supported the conversion of Plaintiffs' properties and assets comprising source code, technology and customer and investors decks, among other things. Karlin knowingly provided financial assistance to Anand and Bellanger to continue using Plaintiffs' properties and assets, including the Agora Blue Source Code and

confidential technology now described in the '722 and '223 Patents.  Karlin continued providing Anand, Bellanger and Prevoty with support and encouragement to maintain the conversion of Plaintiffs' properties and assets even after Plaintiffs provided Karlin with evidence detailing Anand, Bellanger and Prevoty's on-going conversion.  Karlin intended for the conversion of the items mentioned herein to continue.

617.  Launchpad provided support and encouragement, and otherwise supported the conversion of Plaintiffs' properties and assets, among other things.  Launchpad incubated Anand, Bellanger and Prevoty, providing office space and other office services, to enable the conversion.  Launchpad also knowingly provided financial assistance, facilitated introductions, provided business advice, and lent its name and reputation to back Anand, Bellanger and Prevoty's conversion.

618.  Each of Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) also assisted in the conversion of Plaintiffs' equity interest in their company.  Among other things, USVP and Karlin encouraged Anand to purportedly dissolve Agora and cancel its Articles of Organization.  USVP and Karlin also took for themselves equity in Prevoty that rightfully belongs to Plaintiffs, and further helped identify additional entities and individuals who have also wrongfully received Plaintiffs' equity rights.

619.  The assistance provided by each of McNiel, Kaminsky, Stern, Lilling, USVP, Karlin and Launchpad was a substantial factor in enabling and continuing the conversion of Plaintiffs' properties and assets alleged herein and a substantial factor in causing Plaintiffs' damages.

620.  Each of Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) was aware of Defendants' conversion of Plaintiffs' properties and assets and intended that it should occur.

621.  Each of Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) acted with the intent to participate in the ongoing

112

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

conversion of Plaintiffs properties and assets by Anand, Bellanger and Prevoty for the purpose of assisting them in performing the acts constituting the conversion.

622. Plaintiffs seek damages in an amount to be proven at trial.

623. Each of Defendants Stern, Lilling, McNiel, Kaminsky, USVP, Karlin and Launchpad (including Teller) has also acted with fraud, oppression and/or malice. Accordingly, Plaintiffs also seek an award of punitive and special damages.

## EIGHTEENTH CAUSE OF ACTION

### (Trespass to Chattels, Against Defendants Anand and Bellanger)

624. Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

625. As members and officers of Agora, Hullinger and de Bont were in rightful possession of their Agora email accounts and documents on Agora's shared hard drives.

626. Anand intentionally and substantially interfered with Hullinger and de Bont's access to their Agora email accounts and to Agora's shared drives when he unilaterally shut Hullinger and de Bont out of Agora's network. Anand also otherwise shut down access to the agorasec.com network.

627. Hullinger and de Bont's email accounts and shared drives (as well as those of Anand and Bellanger) contained valuable information related to their contributions to Agora's proprietary technology and business development strategies.

628. Hullinger and de Bont's shared drives and agorasec.com email accounts (as well as those of Anand and Bellanger) have independent value because they were used for communicating with customer contacts, investor contacts, advisory contacts and other key resources. Defendants prevented Plaintiffs from accessing these accounts. Anand's interference prevented Hullinger, de Bont and Agora from maintaining communications with prospective clients, investors, advisors and other individuals.

629.  Agora's emails, source code, technical documents and other papers also have independent value because they are necessary for implementing Hullinger and de Bont's respective roles at Agora, for bringing on replacements for Anand and Bellanger's roles, and for continuing the business of Agora.  Anand's interference with Plaintiffs' use of this property has permanently deprived Hullinger, de Bont and Agora of access to their email accounts and shared drives, preventing them from obtaining documents and materials, which they have a right to possess—and which they need in order to do their job and keep the business running.

630.  In so doing, Anand intentionally and substantially interfered with Hullinger, de Bont and Agora's property rights without their consent.

631.  Accordingly, Plaintiffs also seek an award of punitive and special damages.

632.  Defendants Anand and Bellanger also conspired to commit the trespass to chattels described herein.

633.  Anand and Bellanger mutually and surreptitiously agreed and planned—either orally, in writing and/or implicitly through their actions—to undertake the wrongful trespass described above against Plaintiffs.

634.  Anand and Bellanger were both aware of the other's wrongful conduct in furtherance of their plans to commit the trespass, and intended that such trespass should occur.

635.  Accordingly, Anand and Bellanger are responsible and liable for any harm caused by the other co-conspirator based on such trespass.

636.  As a proximate result of Defendants' unlawful conduct, Hullinger, de Bont and Agora have suffered significant damages in an amount to be proven at trial.

637.  Defendants have also acted with fraud, oppression and/or malice. Accordingly, Plaintiffs also seek an award of punitive and special damages.

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

## ADDITIONAL CAUSES OF ACTION RESERVED

638.  Plaintiffs restate and incorporate by reference their previous allegations above, as if fully set forth herein.

639.  Once the '722 and '223 Patents are properly assigned to Agora, Plaintiffs are likely to amend their Complaint to add claims for patent infringement.

640.  Plaintiffs are also continuing to investigate whether Defendants have infringed Plaintiffs' copyright in various source code and other writings belonging to Plaintiffs.  Thus far, Defendants have refused to produce source code, despite the Court's order to do so.  Plaintiffs are likely to amend their Complaint to add claims for copyright infringement after discovery on such issues.

641.  Plaintiffs are also continuing to seek discovery to ascertain the names of other individuals and/or entities that conspired with Defendants and/or aided Defendants in committing the wrongs alleged above.  Plaintiffs intend to amend their Complaint to add claims against these individuals and/or entities.

642.  Plaintiffs also reserve their rights to otherwise amend their Complaint and/or add parties, to the extent permitted by the Court's scheduling order and by the Federal Rules of Civil Procedure.

## DEMAND FOR JURY TRIAL

643.  Plaintiffs hereby demand a jury trial on all claims, damages and any other issues presented herein that are triable to a jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that the Court enter judgment against Defendants Anand, Bellanger, Prevoty, McNiel, Stern, Lilling, Kaminsky, USVP, Karlin and Launchpad (including Teller) and in favor of Plaintiffs as follows:

A.  Enter an Order nullifying the Certificate of Cancellation filed by Defendant Anand and nullifying the purported dissolution, with respect to Plaintiff Agora Systems LLC, and declaring that Plaintiffs Hullinger and de Bont are members of Agora, that Agora continues to exist and—

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

to the extent necessary—order the reinstatement of Agora as a California limited liability company with the California Secretary of State;

B.    In the alternative, declare that Agora continues to exist as a partnership, and declare that Plaintiffs Hullinger and de Bont are partners of Agora;

C.    Declare that Anand has lost the right to participate in management as a member, partner and/or manager of Agora, thereby forfeiting any and all authority previously vested in him with respect to Agora;

D.    Order that Anand and Bellanger be expelled from Agora, under Cal. Corp. Code §§ 17706.02(e) and/or 16601(5);

E.    Order correction of inventorship on the '722 and '223 Patents by adding Hullinger and de Bont as named inventors;

F.    Enter judgment in favor of Plaintiffs finding that Defendants Anand and Bellanger breached their fiduciary duties to Plaintiffs, and that all of the Defendants have aided and abetted Anand and Bellanger's ongoing breach of fiduciary duties;

G.    Declare that the '722 and '223 Patents, as well as International Application No. PCT/US14/30076, U.S. Application No. 14/599,975, International Application No. PCT/US15/12078, U.S. Application No. 14/599,978, International Application No. PCT/US15/12082 and any related applications or patents, as well any other patents in the same field, are owned by Agora, and order Anand and Prevoty to assign such rights to Agora;

H.    Declare that all stock, profits, investments and other property of Prevoty—as well as any salary, bonuses or other moneys or benefits received by Anand or Bellanger with respect to their work for Prevoty—rightfully belong to Plaintiffs, with an accounting of all such stock, profits, investments and other property;

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

I.  Impose a constructive trust against Prevoty, Anand, Bellanger and any others claiming to hold stock or stock options of Prevoty, for the benefit of Agora and/or Hullinger and de Bont, with respect to (a) all stock and other equity of Prevoty, (b) all salaries, bonuses, profits and other benefits received by Defendants Prevoty, Anand and/or Bellanger, (c) all moneys and other consideration received as investments by Defendants Prevoty, Anand and/or Bellanger, and (d) any other property, profit or benefit derived through the conduct of Prevoty, or through use of Agora's property or information, or through the appropriation of any of Agora's opportunities.

J.  Enjoin Anand and the other Defendants from preventing Plaintiffs' access to Agora's email accounts and shared drives;

K.  Enter judgment in favor of Plaintiffs finding that Defendants have committed fraud and constructive fraud, aided and abetted a fraud and constructive fraud, misappropriated Plaintiffs' trade secrets, aided and abetted a misappropriation of trade secrets, wrongfully converted Plaintiffs' property, aided and abetted such wrongful conversion, and trespassed on Plaintiffs' chattels, and continue to do such wrongdoings;

L.  Award compensatory damages caused by Defendants' wrongful conduct outlined herein, to be proven at trial;

M.  Award punitive and exemplary damages for Defendants' intentional, malicious, fraudulent and/or oppressive conduct, and willful and malicious misappropriation of Plaintiffs' trade secrets;

N.  Enter a preliminary and permanent injunction preventing Defendants' use of Plaintiffs' trade secrets;

O.  Disgorge profits and unjust enrichment that have otherwise accrued to Defendants as a result of their wrongful conduct outlined above;

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

P.    Award Plaintiffs their costs and attorneys' fees to the fullest extent permitted by law;

Q.    Award Plaintiffs pre-judgment and post-judgment interest to the fullest extent provided by law;

R.    Declare that Defendants have engaged in a civil conspiracy, such that each Defendant is jointly and severally liable for all moneys awarded; and

S.    Order such other and further relief as the Court deems just and proper.

DATED:  August 12, 2016          By:  _____/s/ Guy Ruttenberg_____

Guy Ruttenberg
RUTTENBERG IP LAW, A
PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260
guy@ruttenbergiplaw.com
*Attorney for Plaintiffs*

THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

## CERTIFICATE OF SERVICE

I certify that I caused to be served counsel of record on August 12, 2016 with THIRD AMENDED AND SUPPLEMENTAL COMPLAINT AND DEMAND FOR JURY TRIAL via CM/ECF.

Executed on August 12, 2016 in Los Angeles, California.

By: _____/s/ Guy Ruttenberg_____

GUY RUTTENBERG

Allan E. Anderson
Jerrold Abeles
Franjo M. Dolenac
Jeffrey R. Makin
Douglas E. Hewlett
ARENT FOX LLP
555 West Fifth Street 48th Floor
Los Angeles, CA 90013-1065
213-629-7400
213-629-7401 (fax)

Stephen A. Scott
Dara Tang
HAYES SCOTT BONINO
ELLINGSON & MCLAY, LLP
203 Redwood Shores Pkwy #480,
Redwood City, CA 94065
650-562-6641
650-637-8071 (fax)

Matthew A. Rips
Marc A. Fenster
Jean Y. Rhee
Paul A. Kroger
Brian D. Ledahl
RUSS AUGUST AND KABAT
12424 Wilshire Boulevard 12th Floor
Los Angeles, CA 90025
310-826-7474
310-826-6991 (fax)